Robert KERMAN, Plaintiff–Appellant,

v.

THE CITY OF NEW YORK, "John" Dilucia, (Shield # 28683), "John" Crossin, (Shield # 499), "John" Paccio, (Shield # 30126), "John" Goldman, (Shield # 1818), "John" Jenkins, (Shield # 10030), "John" Morgan, (Shield # 11995), first names being fictitious and John Hume, Thomas Loomis, Steve Kaminski, Mark Demarco, Andrew Oberfeldt, James Moran, Edward Joergens and "John Doe", "Richard Roe", "Jane Doe", (the last three names being fictitious, said individuals being police officers or other employees of the City of New York who participated in taking plaintiff, Robert Kerman into custody or dispatching police officers to Robert Kerman's home as set forth in the complaint), Defendants–Appellees.

Docket No. 03–7243.

United States Court of Appeals, Second Circuit.

Argued: Nov. 3, 2003.

Decided: June 28, 2004.

Gregory Abbey, Brooklyn, New York, for Plaintiff–Appellant.

Marta Ross, Assistant Corporation Counsel, New York, New York (Michael A. Cardozo, Corporation Counsel for the City of New York, Edward F.X. Hart, William S.J. Fraenkel, New York, New York, on the brief), for Defendants–Appellees.

Before: FEINBERG, KEARSE, and RAGGI, Circuit Judges.

Judge RAGGI dissents, in part, in a separate opinion.

KEARSE, Circuit Judge.

This case returns to us after proceedings on remand following an appeal in which we, *inter alia*, reversed district judges' dismissals as a matter of law, on the ground of qualified immunity, of certain claims brought by plaintiff Robert Kerman under 42 U.S.C. § 1983 against defendant William Crossan (styled " 'John' Crossin" in the caption), a New York City police officer, in connection with Crossan's order that Kerman be detained and taken to a hospital for psychiatric observation, *see Kerman v. City of New York*, 261 F.3d

229 (2d Cir.2001) ("*Kerman II*"), aff'g in part and rev'g in part Kerman v. City of New York, No. 96 Civ. 7865(LMM), 1999 WL 509527 (S.D.N.Y. July 19, 1999) ("*Kerman I*"). Kerman now appeals (a) from so much of the final judgment entered in the United States District Court for the Southern District of New York, following a retrial before Robert P. Patterson, Jr., *Judge,* as dismissed his Fourth Amendment unlawful seizure claim against Crossan, as well as his parallel state-law false imprisonment claims against Crossan and defendant City of New York ("City"), for unlawful detention and involuntary hospitalization; and (b) from a postjudgment order (i) denying, on the ground that Crossan is entitled to qualified immunity as a matter of law, Kerman's motion to correct the judgment in light of the jury's finding that Crossan had ordered Kerman's detention and involuntary hospitalization without probable cause, and (ii) denying Kerman's motion for a new trial as to damages for that deprivation of his liberty. On appeal, Kerman contends principally that the district court erred in ruling that Crossan was entitled to qualified immunity as a matter of law (1) because, there being no new evidence material to that issue, such a ruling was foreclosed by the *Kerman II* holding that Crossan was not entitled to qualified immunity as a matter of law, (2) because Crossan waived his qualified immunity defense by not pursuing it at trial, and (3) because the ruling was based on factual findings by the district court that usurped the function of the jury. Kerman also contends that the court abused its discretion in denying his motion for a new trial as to damages on his unlawful seizure and false imprisonment claims, given the jury's refusal to award more than nominal damages despite its finding that he had been deprived of his liberty without probable cause. Finding substantial merit in most of Kerman's contentions, we reverse

so much of the judgment as dismissed the above claims, and we remand for a new trial as to damages on those claims.

## I. BACKGROUND

The events leading to the present litigation are described in *Kerman II,* 261 F.3d at 232–34, familiarity with which is assumed. They are summarized below to the extent necessary for discussion of Kerman's Fourth Amendment and false imprisonment claims. To the extent that there are factual disputes relevant to defendants' liability on those claims, we view the record in the light most favorable to Kerman, both as the party in whose favor the jury found on the issue of unlawful deprivation of liberty and as the party against whom judgment was entered, on qualified immunity grounds, as a matter of law.

### A. *The Events*

It is undisputed that at about 5 or 6 a.m. on October 20, 1995, Kerman, who had a history of depression and borderline personality disorder, telephoned his girlfriend Phyllis Landau and stated that he might purchase a gun to commit suicide and might kill his treating psychiatrist, Dr. Morris Brozovsky, as well. Landau was aware that Kerman had recently stopped taking antidepressant medication in preparation for his participation in an experimental study conducted by the New York State Psychiatric Institute at Columbia Presbyterian Hospital. At approximately 11 a.m., she telephoned Dr. Kevin Malone, the psychiatrist in charge of that study, and described her conversation with Kerman. On Dr. Malone's recommendation, Landau then called 911. She gave the 911 operator Kerman's address and telephone number and stated that a mentally ill man at that address had recently ceased taking antidepressant medication he had been

taking for roughly 20 years, that he had called her that morning while drunk and irrational, and that he might have a gun. Landau did not disclose Kerman's name, her own name, or her relationship with Kerman.

The 911 operator relayed Kerman's address to City police officers, stating that there was an emotionally disturbed person there, possibly with a gun, but providing no further information. Shortly thereafter, a team of officers arrived at Kerman's apartment, rang the doorbell, and pounded on the door until Kerman responded. Kerman, who had been in the shower, eventually opened the door a crack wrapped in a towel, whereupon the officers burst through. Kerman testified that the door hit him in the head and knocked him to the floor and that, in the process, the towel in which he had wrapped himself came off, leaving him naked. The force of the entry also ruptured a plastic bag of used kitty litter, which Kerman had placed near the front door in order to remind himself to take it out, and strewed its contents across his foyer. Kerman, still wet from his shower, became covered in kitty litter when he was knocked to the floor.

The officers immediately handcuffed Kerman with his hands behind his back and searched his apartment for a gun. No gun was found.

Some 30 minutes after the officers' initial entry, two New York City emergency medical services paramedics arrived. Throughout this time, Kerman had remained handcuffed and naked. The police officer in charge was then-sergeant Crossan. At about 1:00 p.m., on Crossan's instructions, the paramedics placed Kerman, still handcuffed, in a "restraint bag" and took him to Bellevue Hospital. At Bellevue, Kerman's handcuffs were re-moved, but he was held overnight for observation. He was released the next day.

The evidence as to the relevant conduct of the respective parties at Kerman's apartment after completion of the search for a gun, and as to certain events at the hospital, is discussed more fully in Parts I.D., II.A.2., II.A.3., and II.C. below.

## B. Kerman I *and the First Trial*

Kerman commenced the present action against the City, Crossan, and eight other City police officers under 42 U.S.C. § 1983, alleging, *inter alia,* that his Fourth Amendment rights had been violated by the warrantless entry into his apartment, by his initial seizure, and by his subsequent involuntary detention and hospitalization. Kerman also asserted that various ways in which the officers treated him after the initial seizure—which included keeping him naked, refusing to let him give medicine to his sick cat, sending him to the hospital, transporting him on his back with his hands painfully cuffed under his 270-pound body, and sending him to Bellevue Hospital rather than to a hospital closer to his home or to Dr. Malone—were motivated by Crossan's desire to retaliate against Kerman for exercising his First Amendment right by expressing derogatory views of the policemen in his apartment and threatening to sue them. The complaint also asserted state-law claims principally for battery, false imprisonment, and intentional infliction of emotional distress.

In *Kerman I,* District Judge Lawrence M. McKenna, to whom the case was then assigned, granted partial summary judgment in favor of all nine police officers, dismissing all of Kerman's claims except those alleging that the officers' actions after they handcuffed Kerman (1) violated his federal constitutional right not to be subjected to excessive force and (2) constituted battery in violation of state law. As

to the dismissed claims against the individuals, the court ruled, *inter alia,* that the conduct attributed to them was reasonable and that they were thus entitled to qualified immunity as a matter of law on Kerman's First Amendment and unlawful seizure claims. *See Kerman I,* 1999 WL 509527, at *4–*8.

The court dismissed Kerman's § 1983 claims against the City for lack of any allegation or evidence that the alleged deprivations of his constitutional rights resulted from any municipal policy or custom. *See id.* at *8. The state-law battery claim against the City was not dismissed; the City does not dispute that it would be liable for intentional state-law torts found to have been committed by the officers. The § 1983 claim against Crossan for excessive force and the state-law claims against Crossan and the City for battery remained for trial.

Thereafter, the case was reassigned to Judge Patterson, and a jury trial was held on the two undismissed claims. The jury found in favor of all of the officers on the battery claim and in favor of all officers except Crossan on the excessive force claim. On the excessive force claim against Crossan, the jury awarded Kerman compensatory damages of $75,000 and indicated that punitive damages were warranted. The district court viewed the jury's verdict in favor of Crossan on the battery claim but against him on the excessive force claim as inconsistent, and it instructed the jury to resume deliberations. When the jury thereafter was unable to reach a unanimous verdict on the excessive force claim, the court granted a motion by Crossan pursuant to Fed.R.Civ.P. 50 for judgment as a matter of law ("JMOL"), dismissing that claim on the ground that Crossan was entitled to qualified immunity. Accordingly, judgment was entered

dismissing all of Kerman's claims against all defendants.

### C. *This Court's Decision in* Kerman II

Kerman appealed virtually all of the district judges' rulings, and in *Kerman II* we affirmed most of those decisions, including the dismissals of all claims against the officers other than Crossan. However, with respect to Kerman's detention and involuntary hospitalization after the officers had searched for and failed to find a gun, we reversed Judge McKenna's grant of summary judgment dismissing the First and Fourth Amendment claims against Crossan for, respectively, retaliation and unlawful seizure, as well as the state-law claims against Crossan and the City for false imprisonment and intentional infliction of emotional distress. We also reversed Judge Patterson's qualified-immunity-based grant of JMOL in favor of Crossan on Kerman's claim for use of excessive force after the officers failed to find a gun.

In reversing Judge McKenna's immunity-based grant of summary judgment dismissing the claims relating to involuntary detention and hospitalization, we noted that although the police may be entitled to hospitalize a person "if his conduct or the condition of his apartment demonstrate[s] a dangerous mental state," an officer who orders a warrantless seizure and detention for psychiatric evaluation cannot escape liability if his decision is "outside the bounds of both the Fourth Amendment and the qualified immunity standards of objective reasonableness." *Kerman II,* 261 F.3d at 241. The officer "is not free to disregard plainly exculpatory evidence." *Id.* (internal quotation marks omitted). We noted defendants' contention that Crossan's order for Kerman's hospitalization was privileged under state-law provisions that allow a police officer to detain or hospitalize " 'any person who appears to be

mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others.'" *Id.* at 240 n. 8 (quoting N.Y. Mental Hygiene Law § 9.41). We interpreted this provision as imposing "the same objective reasonableness standard" that is imposed by the Fourth Amendment. *Kerman II,* 261 F.3d at 240 n. 8. We held that the evidence as to the period after the officers entered the apartment, restrained Kerman, and found no gun created several disputed issues of material fact that made summary judgment dismissing the unlawful seizure claim on the ground of qualified immunity inappropriate, *see id.* at 240–41, and made summary dismissal of the false imprisonment claims on the basis of state-law privilege equally inappropriate, *see id.* at 244.

First, there was an issue as to whether Crossan—who alone made the decision that Kerman should be sent to the hospital, *see* 261 F.3d at 241—made any reasonable effort to inquire into the need for that action. For example, while the officers were in the apartment Landau called the apartment and identified herself as the person who had called 911. According to Kerman, the officers gave her "short shrift," not bothering to ask her any questions about Kerman's condition or his earlier statements or behavior. *Id.* More importantly, the officers had had the opportunity to question Dr. Malone. According to Kerman, one of the paramedics, Larry Pontrelli, telephoned Dr. Malone at Kerman's request and held the phone up so that Kerman-still handcuffed—could speak to the doctor. Kerman spoke briefly with Dr. Malone and asked the doctor to "get these goons out of here," whereupon Crossan grabbed the phone from Pontrelli and hung up on the doctor without speaking to him or "making any effort to ascertain whether Kerman presented a threat to himself or oth-

ers." *Id.* No officer asked Dr. Malone about Kerman's mental health.

We recognized in *Kerman II* that police officers often must make instant assessments with regard to a person's mental health and must be accorded considerable latitude as to the judgments they reach. From the above evidence, however, a jury could find that, after the officers' initial entry, restraint of Kerman, and search for a gun, Crossan had had an unhurried "opportunity to consult a medical professional familiar with the patient's condition," had forgone that opportunity, and indeed had "deliberately ignored two opportunities to confirm the seriousness of Kerman's condition." 261 F.3d at 241. Plainly, a jury could find that this conduct was unreasonable, *see id.* ("We cannot see the reasonableness of hanging up on a doctor in such a situation."), thereby impeding Crossan's defense of qualified immunity, *see id.* ("a fact-finder" crediting Kerman's account of the facts "could well find that the police acted outside the bounds of both the Fourth Amendment and the qualified immunity standards of objective reasonableness in placing Kerman in restraints for his eventual transport to Bellevue"); *see also id.* (in Kerman's version, "the police not only failed to reasonably investigate his mental state, they also grossly misjudged the situation as it unfolded before them").

Factual disputes also existed with respect to Kerman's demeanor and conduct over the course of his encounter with the police. Although the officers' testimony characterized Kerman as "ranting, screaming and acting unstable," Kerman testified that he was calm and cooperative during most of the incident. *Id.* Further, there was a dispute as to the condition of Kerman's apartment. Though the officers portrayed it as a proverbial "Augean sta-

ble," Kerman said it was, "at worst, untidy." *Id.*

Accordingly, we remanded for trial of Kerman's constitutional and state-law claims against Crossan and the City for unlawful detention and involuntary hospitalization, as well as for the manner in which Kerman was treated after his initial seizure and handcuffing, including the alleged retaliation and use of excessive force. We stated as follows:

> Kerman's allegations are serious and given his account Judge McKenna's *summary judgment for Officer Crossan on qualified immunity grounds was not appropriate* .... However, defendants tell a different story, and *given the disputed accounts, a jury should decide what transpired between the officers and Kerman.* Once the outstanding factual questions are answered, there will remain for decision in the district court the issues of whether officer Crossan violated the Fourth Amendment and, if so, whether he is nevertheless entitled to qualified immunity.

261 F.3d at 241 (emphases added). We ruled that the resolution of Kerman's state-law false imprisonment claims and defendants' claims of state privilege likewise required further factfinding. *See id.* at 244.

D. *The Evidence at the Second Trial*

On remand, a jury trial was held on (a) the Fourth Amendment claims against Crossan for unlawful detention, involuntary hospitalization, and use of excessive force, (b) the First Amendment claim against Crossan for retaliation, and (c) the state-law claims against Crossan and the City for false imprisonment and intentional infliction of emotional distress. The evidence at trial included testimony by Kerman, Landau, Pontrelli, Crossan, and several other police officers, and deposition testimony of Dr. Malone.

Kerman again testified, *inter alia,* that after the officers had searched for a gun in vain, they kept him handcuffed and naked. He indicated that although he was shocked by the entry and presence of the policemen, and although he made caustic remarks to and about the officers, he was not lacking in calm. Although two police officers testified that Kerman's apartment was filthy and smelled of cat urine and feces (*see* Tr. 283) and that the sink was full of flatware and dirty dishes (*see* Tr. 270), Kerman testified that though the apartment was "messy[ and] very disorganized" (Tr. 504), it was merely "messy, but not dirty" (Tr. 505). Kerman testified, "I kept the kitchen clean. And I kept the bathroom immaculate" (Tr. 505), explaining that he kept the place clean because his cat had had a kidney transplant (*see* Tr. 77) and needed to be protected against infection (*see* Tr. 505). Kerman stated that the condition of his foyer—which, after the officers entered, was covered with kitty litter and cat feces—resulted from the officers' crashing through his door and causing the waste bag, which he had planned to take out, to burst open.

Kerman testified that while the officers were in his apartment, he gave officer John Hume the name and telephone number of his psychiatrist, Dr. Brozovsky; Hume called, got no answer, and hung up. After Kerman suggested that Hume leave a message for Dr. Brozovsky to call the apartment, Hume did so. Kerman also testified that before Crossan caused him to be taken to Bellevue Hospital, Crossan cut off a telephone call to Dr. Malone after Kerman told Pontrelli that Dr. Malone wanted to speak to the police. Pontrelli had placed the telephone to Kerman's ear; Kerman asked Dr. Malone to "get these goons out of my house" (Tr. 136), whereup-

on Crossan grabbed the phone from Pontrelli and pushed the "off" button, hanging up (Tr. 485).

Landau testified that she telephoned Kerman's apartment while the officers were there and identified herself as the person who had called 911. (*See* Tr. 234–35.) The person to whom she spoke—eventually identified as officer Hume—hung up on her. (*See* Tr. 236.) Dr. Malone, in his deposition, testified that while the officers were in Kerman's apartment one of the paramedics telephoned him and allowed Kerman to speak to him; but when Kerman asked Dr. Malone to "get these goons out of here," the telephone call "was terminated" because "the phone was hung up . . . . in the middle of [the] conversation." (Tr. 652.) Dr. Malone testified that while they spoke, Kerman had seemed "coherent," "insightful," and even "witty." (Tr. 662–63; *see id.* at 652 (Kerman, when asked by Dr. Malone why he was upset about the officers searching his apartment for a gun, "said 'That he used lawyers, not guns' ").) Dr. Malone testified that he did not speak to any police officer. (*See, e.g.,* Tr. 651, 654.)

Crossan testified that he made the decision to remove Kerman from his home and send him to the hospital (*see* Tr. 524), and he denied having hung up on anyone (*see* Tr. 569). Crossan described his normal procedures in responding to complaints about emotionally disturbed persons (*see, e.g.,* Tr. 610–14), but he remembered few details of the events involving Kerman (*see, e.g.,* Tr. 623, 625). Crossan remembered that the radio dispatch that directed the officers to Kerman's apartment mentioned an emotionally disturbed person and a firearm. (*See* Tr. 542, 615; *see also id.* at 276 (testimony of officer Daniel DiLucia: "We received a central radio call saying that there was an EDP [emotionally disturbed person] with a gun. . . . Nothing

other than that.").) Crossan did not recall whether he telephoned the dispatcher to obtain any further information about the 911 call. (*See* Tr. 529–32.)

Crossan did not recall whether he had had any conversation with Kerman. (*See* Tr. 552.) He did not recall whether Landau telephoned the apartment. (*See, e.g.,* Tr. 549.) Crossan remembered that officer Hume (who testified at the first trial but not at the second) was in the apartment and spoke with someone on the telephone; but Crossan could not recall whether Hume spoke with Landau, or whether he heard Hume's side of any conversation, or whether he had any discussion with Hume. (*See, e.g.,* Tr. 528–29.) Crossan also did not recall whether Kerman had a telephone conversation with his doctor (*see* Tr. 556). Further, although two other police officers testified that they had seen Crossan talking on the telephone in Kerman's apartment and believed he was speaking with a psychiatrist because he was addressing someone as "Doctor" or "Doc" (Tr. 398, 401–02, 452–53), Crossan did not remember whether he had any conversation with Kerman's doctor or indeed whether he spoke on the telephone with anyone (*see, e.g.,* Tr. 550–52, 529).

Crossan testified that Kerman was incoherent and would not calm down. (*See* Tr. 536.) At his deposition, Crossan had described Kerman's behavior as irrational only in that Kerman was " '[s]creaming and yelling' " (Tr. 537; *see also id.* (" 'Q. Anything else in addition to screaming and yelling? A. Not that I recall specifically.' ")); at trial, Crossan testified that he would not regard screaming and yelling in and of itself as fitting within the definition of conduct that was likely to result in harm to oneself or to others (*see* Tr. 532–33). Crossan also did not recall any of the contents of Kerman's shouts except that there were references to Hitler and Mark

Furhman; Crossan did not consider those references to be an indication of dangerousness. (*See* Tr. 537–39.)

Crossan testified that "[t]he only thing that made this case memorable was the fact that Mr. Kerman was naked." (Tr. 627.) Crossan did not regard a person's nakedness in his own home, in and of itself, to be an indication of dangerousness to himself or others. (Tr. 543.) However, Crossan did not recall asking Kerman why he was naked, although Crossan would have considered the reason for his being in that condition to be material to an assessment of whether Kerman was dangerous. (*See* Tr. 546–48.)

As to the events following the order that Kerman be taken to the hospital, Kerman testified, *inter alia*, that when he arrived at Bellevue, he was given a hospital gown and paper slippers to wear (the police officers had let him put on only sweatpants before sending him to the hospital); the handcuffs were removed, and he was allowed to make local telephone calls. However, he was placed in a room that had a red line on the floor and was ordered not to cross that line without permission; he was not allowed to use the bathroom without permission; and he "felt like [he] was in prison" (Tr. 152). Kerman was never formally admitted to Bellevue but was kept there overnight.

Kerman testified that he suffered physical pain from the manner in which he was treated, including being transported to the hospital on his back with his hands cuffed under him. He testified that he suffered emotional distress from various aspects of the incident and from the event as a whole. There was also evidence that Kerman developed post-traumatic stress disorder as a result of the event and that his prior depression worsened.

E. *The Instructions, the Jury Interrogatories, and the Verdict*

Prior to the submission of the case to the jury, Crossan and the City moved for judgment as a matter of law with respect to Kerman's claim of retaliation for the exercise of his First Amendment rights. Their attorney stated as follows:

> It's the defendant's [*sic*] position that Rule 50 should be granted. We don't believe that certainly any reasonable juror could conclude, and in fact we do not believe that the law permits First Amendment violations [*sic*] for the specific acts that are complained of herein, at least insofar as it includes keeping plaintiff naked while in his apartment, refusing to allow plaintiff to medicate his cat, and sending him to one particular hospital rather than another particular hospital. We don't believe that certainly at the bare minimum, none [*sic*] of those could constitute a First Amendment retaliation claim no matter what plaintiff establishes. I don't believe any of those rise to the level.

(Tr. 666.) The district court reserved decision.

The jury was asked to return a general verdict and to answer 17 written interrogatories. The parties agreed on the following interrogatories, some of which repeated factual questions that were common to different legal claims. With respect to the federal claims and the claims of false imprisonment, the jury was asked whether Kerman proved that Crossan, personally or through his subordinates, intentionally or recklessly subjected Kerman to excessive force after he was placed in handcuffs (Question 1); if so, whether those acts were a proximate cause of injury to Kerman (Question 2); whether Crossan proved that, after completion of the search for a gun, probable cause existed to keep Kerman in custody

and cause him to be taken to the hospital (Questions 3, 7, and 8); if so, whether the postsearch custody and hospitalization were a proximate cause of injuries to Kerman (Questions 4 and 9); whether Kerman proved that various listed acts by Crossan were motivated or substantially caused by Kerman's exercise of his free speech rights (Question 5); and if so, whether Kerman proved that those acts chilled his right to free speech (Question 6). As to the claim of intentional infliction of emotional distress, the jury was asked whether Kerman proved that Crossan's conduct toward him was so outrageous or shocking that it exceeded all reasonable bounds of decency (Question 10), or caused him severe emotional distress (Question 11); and whether Kerman proved that Crossan acted with the desire to cause him such distress (Question 12), or under circumstances that Crossan should have known would cause Kerman severe emotional distress (Question 13), or recklessly and with utter disregard of the possible consequences (Question 14). As to damages, the jury was asked "[w]hat amount of damages do you find Plaintiff suffered" as a result of defendants' actions (Question 15); if it found no such damages, whether it wished to award nominal damages of $1 or less (Question 16); and whether it wished to award punitive damages (Question 17).

To the extent pertinent here, the district court instructed the jury that, with respect to Kerman's Fourth Amendment claim for unlawful seizure and his state-law claims for false imprisonment, the elements were essentially the same. (*See, e.g.,* Tr. 756.) In describing these claims, the court stated:

[A] person may not be taken into custody and brought to the hospital without probable cause. In considering this element, you may consider New York Mental Hygiene Law, section 9.41, which

states: "Any ... police officer ... may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others."

New York Mental Hygiene Law does not require that the threat of substantial harm to oneself or others be evidenced by an overt act, attempts or threats. The threat of harm can be evidenced by the behavior of the person or by neglect or refusal to care for oneself, as long as that behavior, neglect or refusal to care for oneself was likely to result in serious harm to himself or others.

(Tr. 749–50.)

In describing the nature of probable cause, the district court instructed that

[i]n order for a police officer to have probable cause to keep a person in custody and bring him to the hospital, the police officer must have information that would lead a reasonable police officer who possesses the same information as the officer to conclude that the person being taken into custody and brought to the hospital appears to be mentally ill and is conducting himself in a manner which is likely to result in serious harm to himself or others. *The officer making the decision should take into consideration all the evidence of plaintiff's mental condition available to him under the circumstances, whether it be favorable or unfavorable.*

(Tr. 750 (emphasis added).) The court instructed the jury that the burden was on Crossan to prove the existence of probable cause for Kerman's detention and hospitalization. (*See* Tr. 751.)

With regard to Crossan's defense of qualified immunity, the district court had stated in colloquy with counsel that "there have to be findings put to the jury that

relate not to the conclusion of the qualified immunity but to the facts underlying it," identifying "the factual finding" as whether Crossan had "[p]robable cause to send [Kerman] to the hospital." (Tr. 465.) Agreeing with this view, Crossan asked the court to instruct the jury that "[d]efendant Crossan claims that he had probable cause to keep plaintiff in protective custody and send plaintiff to the hospital for observation, and thereby had qualified immunity for the federal claims asserted." (Defendants' Requested Charge to the Jury, dated April 18, 2002, at 6 (emendations omitted).) The court instructed the jury accordingly, albeit "without reference" to the term qualified immunity (Tr. 676), reiterating virtually verbatim its prior instruction on the nature of probable cause, i.e., that

the police officer must have information that would lead a reasonable police officer who possesses the same information as the officer to conclude that the person being taken into custody and brought to the hospital appears to be mentally ill and is conducting themselves [*sic*] in a manner which is likely to result in serious harm to himself or others.

(Tr. 755.) The court followed with a virtually verbatim repetition of its earlier instruction that "[t]his does not require that the threat of substantial harm be evidenced by an overt act, attempts or threats. Threat of harm can be evidenced by the behavior of the person or by neglect or refusal to care for oneself as long as that behavior, neglect or refusal to care for oneself was likely to result in serious harm to himself or others." (*Id.*)

On injury and proximate cause, the court instructed that

if you find that the defendant Crossan's action deprived plaintiff of his right to be free from unlawful seizure, you must consider whether plaintiff has shown by a preponderance of the evidence that the deprivation of plaintiff's constitutional right to be free from unlawful seizure is the proximate cause of the injuries he is alleging.

(Tr. 751.) The court referred to Kerman's assertions of physical pain and mental suffering and to "that amount of money which will fairly and reasonably make plaintiff whole or compensate him for the physical pain and suffering and/or the mental anguish that he has shown he sustained." (Tr. 760–61.) The court stated that

[*c*]*ompensatory damages* are damages which compensate the plaintiff for the injuries which the defendant wrongfully caused him. They *are damages which fairly and reasonably compensate plaintiff for his medical expenses and the pain and the injury, including the emotional and mental anguish that he claims he sustained* as a consequence of the defendant's violation of his constitutional rights or violation of state law. Plaintiff's right to recover damages is not limited by the fact that his injury resulted from an aggravation of a preexisting condition.

(Tr. 760 (emphasis added).) The court also instructed the jury that it could award Kerman nominal damages:

Nominal damages may be awarded when the plaintiff has been deprived of a right or [*sic*] has suffered no actual damages as a natural consequence of that deprivation. Therefore, if you find that the plaintiff has suffered no injury as a result of any of the defendant's conduct, other than the fact of the deprivation of a legal right, you may award, if you so choose, nominal damages not to exceed $1.

(Tr. 761.) However, the court instructed the jury that it should not reach the issue of damages at all unless it found that

Kerman had carried his burden of proving liability:

> If you find that the plaintiff carried his burden of proving by a preponderance of the evidence that the defendant violated any of his constitutional rights, or that the defendant in this case violated New York State tort law, *and that those acts were a proximate cause of damages* to the plaintiff, *then, but only then,* must you consider the amount of damages which will fairly and reasonably compensate plaintiff for those injuries sustained as a result of that violation of his constitutional rights or a violation of New York State law.
>
> . . . . Obviously, *you need not reach the issue of damages, unless you determine that plaintiff has established liability on any one of his claims* by a preponderance of the evidence.

(Tr. 759–60 (emphases added).)

The jury found that Kerman was entitled only to an award of nominal damages on his claims for unlawful seizure and false imprisonment. It rejected his claims (1) that Crossan's treatment of Kerman was motivated by Kerman's exercise of his free speech rights, (2) that Crossan personally or through the other officers subjected Kerman to excessive force after placing him in handcuffs, and (3) that Crossan intentionally and outrageously subjected Kerman to emotional distress. (*See* Tr. 781–83.) However, as to both Kerman's Fourth Amendment claim for unlawful seizure after the completion of the search for a gun and his parallel state-law claims for false imprisonment, the jury found that Crossan had failed to prove that probable cause existed to keep Kerman in custody and cause him to be taken to the hospital. (*See* Tr. 781, 783.) Nonetheless, with respect to the seizure and false imprisonment claims, the jury found that Kerman had not proven that his continued custody or involuntary hospitalization were a proximate cause of injuries. (*See* Tr. 781, 783.) The jury found that Kerman should not be awarded compensatory or punitive damages (*see* Tr. 783–84) but that he should be awarded "nominal damages of one dollar or less" (Tr. 784).

The district court, ruling that the jury "ha[d] returned a verdict in favor of the defendants," entered judgment dismissing the complaint in its entirety. (Judgment dated April 23, 2002.)

### F. The Posttrial Motions and Kerman III

Following the entry of judgment, Kerman promptly moved pursuant to Fed. R.Civ.P. 60 for correction of the judgment to reflect that the jury had found in his favor on the Fourth Amendment unlawful seizure and state-law false imprisonment claims. He also moved pursuant to Fed. R.Civ.P. 59 for a new trial with respect to damages on those claims. At the hearing on those motions, Crossan argued that the jury had found against Kerman on liability because it found that Kerman had not proved that Crossan's restraints without probable cause were the proximate cause of the injuries he claimed. (Posttrial Hearing, July 10, 2002 ("Posttrial Tr."), at 5–8, 12–13; *see also id.* at 31 ("The jury said there is no liability").) To parry Kerman's anticipated response that the jury must have found liability because it found that nominal damages should be awarded (*see id.* at 9–10), Crossan argued that the court "c[ould] examine this verdict form and find that it's consistent" by inferring that the jury had found that, though there was no probable cause to detain Kerman and send him to Bellevue, Kerman "ha[d] suggested that he [wa]s willing to go" (*id.* at 17; *see id.* at 14–17).

In addition, at the oral argument of these motions, Crossan argued for the first

time that the court should leave the judgment undisturbed because he was entitled to qualified immunity. Kerman argued that Crossan was not entitled to judgment on that basis because, *inter alia*, he had not asked that the questions necessary for the resolution of all of the factual issues material to that defense be put to the jury (*see* Posttrial Tr. 23), and because the *Kerman II* opinion held that, taking the evidence in the light most favorable to Kerman, Crossan was not entitled to qualified immunity as a matter of law (*see id.* at 40). At the request of the district court, the parties thereafter briefed the issue of qualified immunity.

In an opinion dated February 11, 2003, *Kerman v. City of New York*, No. 96 Civ. 7865(RPP), 2003 WL 328297 (S.D.N.Y. Feb.11, 2003) ("*Kerman III* "), the district court stated that Kerman's Rule 60 motion "is granted," though "mooted," *id.* at *1, *8; and as discussed in Part II.C. below, the court found no merit in Kerman's Rule 59 motion for a new trial, *see id.* at *3–*4. As to the Rule 60 motion, the court stated that

> [t]his Court entered judgment in favor of Defendants because the jury found that (1) Plaintiff had not proved by a preponderance of the evidence that the continued custody of Plaintiff after the search for the gun was a proximate cause of injury to Plaintiff and (2) Plaintiff had suffered no actual damages; and because Plaintiff's summation did not ask the jury for an award of nominal damages based solely on a deprivation of his Constitutional rights.

*Id.* at *3. The court concluded that Kerman's Rule 60 motion had merit because a Fourth Amendment violation could warrant a judgment for nominal damages without proof of actual damages. *See id.* However, the court ruled that the judgment should nonetheless remain unchanged because any correction of the judgment would be "mooted" by reason of the court's conclusion in *Kerman III* that Crossan was entitled to judgment as a matter of law on the ground of qualified immunity. *Id.* at *1, *8.

In ruling that Crossan was entitled to qualified immunity, the district court held both that "Crossan's actions did not violate clearly established law" and that "it was objectively reasonable for Defendant Crossan to believe that his action did not violate existing law." *Kerman III*, 2003 WL 328297, at *8. The court held that the law was not clearly established because the court "ha[d] been referred to no Supreme Court or Second Circuit authority which states on what grounds a police officer may determine to place an emotionally disturbed person in custody and send him to the hospital for evaluation." *Id.* at *5.

In determining that Crossan's actions were objectively reasonable, the court stated that it "w[ould] disregard" the defense testimony that Kerman "was screaming and yelling, was incoherent, and would not calm down," given Kerman's testimony to the contrary; but it found that "there is no dispute that Defendant Crossan and his fellow police officers ascertained that Plaintiff was under psychiatric care and was conducting himself in a manner that was likely to result in serious harm to himself and others." *Id.* at *7. The evidence not disregarded by the court was, apparently, testimony that Kerman "refus[ed] to respond to questions or to allow a complete physical examination to be taken by EMS paramedic, Pontrelli," *id.* at *6. The court also found that "[t]he filthy conditions in Plaintiff's apartment [were] testified to by the officers and admitted by Plaintiff," *id.*, and that those conditions and Kerman's appearance—" 'wearing nothing' " and " 'covered in kitty litter,' " *id.* at *7 (quoting Tr. 122)—provided

"signs that [Kerman] was unable to care for himself," *id.*

The court also ruled that Crossan was entitled to immunity under state law:

> Lastly, § 9.59 of the New York Mental Hygiene Law provides that "any police officers ... who are taking into custody and transporting a person to a hospital ... shall not be liable for damages for injuries alleged to have been sustained by such person ... unless it is established that such injuries ... [were] caused by gross negligence." Defendant Crossan's actions do not rise to the level of gross negligence, i.e. reckless disregard or intentional wrongdoing. *See e.g., Woody v. Astoria General Hospital,* 264 A.D.2d 318, 319, 694 N.Y.S.2d 41[ ](1999).

*Kerman III,* 2003 WL 328297, at *6.

Thus, the April 23, 2002 judgment, dismissing all of Kerman's claims, remained unchanged. This appeal followed.

## II. DISCUSSION

On appeal, Kerman contends principally that the district court could not properly grant judgment in favor of Crossan on the basis of qualified immunity because (a) Crossan waived the defense by not pursuing it at trial; (b) the district court's ruling that Crossan was entitled to qualified immunity as a matter of law was foreclosed by *Kerman II*'s holding that Crossan was not entitled to summary judgment on that defense; and (c) the district court's ruling was based on factual findings by the court that usurped the function of the jury. Kerman also contends that the district court abused its discretion in denying his motion for a new trial on the issue of damages. While we do not agree with certain of Kerman's waiver arguments, we conclude, for the reasons that follow, (1) that the court erred in ruling that Crossan was entitled to qualified immunity, and (2)

that the court should have granted a new trial as to damages on Kerman's Fourth Amendment and false imprisonment claims.

### A. *Crossan's Qualified Immunity and Privilege Defenses*

■ The defense of qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A right is sufficiently clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

> As a general rule, police officers are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights.

*Oliveira v. Mayer,* 23 F.3d 642, 648 (2d Cir.1994), *cert. denied,* 513 U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995); *see, e.g., Wilson v. Layne,* 526 U.S. 603, 614–15, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

■ The matter of whether a right was clearly established at the pertinent time is a question of law. *See, e.g., Crawford–El v. Britton,* 523 U.S. 574, 589, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. 2727, 73 L.Ed.2d 396; *X–Men Security, Inc. v. Pataki,* 196 F.3d 56, 66 (2d Cir.1999); *Genas v. State of New York Department of Cor-*

*rectional Services,* 75 F.3d 825, 830 (2d Cir.1996). In contrast, the matter of whether a defendant official's conduct was objectively reasonable, *i.e.,* whether a reasonable official would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact. *See, e.g., Lennon v. Miller,* 66 F.3d 416, 422 (2d Cir.1995); *Oliveira v. Mayer,* 23 F.3d at 649–50. A contention that—notwithstanding a clear delineation of the rights and duties of the respective parties at the time of the acts complained of—it was objectively reasonable for the official to believe that his acts did not violate those rights "has its principal focus on the particular facts of the case." *Hurlman v. Rice,* 927 F.2d 74, 78–79 (2d Cir.1991); *see, e.g., Oliveira v. Mayer,* 23 F.3d at 649–50. Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, *see, e.g., Lennon v. Miller,* 66 F.3d at 421; *Glass v. Mayas,* 984 F.2d 55, 58 (2d Cir.1993); *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987), if there is such a dispute, the factual questions must be resolved by the factfinder, *see, e.g., Kerman II,* 261 F.3d at 241; *Oliveira v. Mayer,* 23 F.3d at 649; *Calamia v. City of New York,* 879 F.2d 1025, 1036 (2d Cir. 1989). "Though '[i]mmunity ordinarily should be decided by the court,' ... that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required ...." *Oliveira v. Mayer,* 23 F.3d at 649 (quoting *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)). After receiving *"the jury['s] ... deci[sion as to] 'what the facts were* that the officer faced or perceived,'" the court then may "make the ultimate legal determination of whether qualified immunity attaches *on those facts." Stephenson v. Doe,* 332 F.3d 68, 81

(2d Cir.2003) (emphases added); *see, e.g., Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.) ("*If there are unresolved factual issues which prevent an early disposition of the defense, the jury should decide these issues* on special interrogatories. The ultimate legal determination whether ... a reasonable police officer should have known he acted unlawfully" should be made by the court "on the facts found" by the jury. (emphasis added)), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990).

In ruling that Crossan was entitled to qualified immunity as a matter of law, the district court held, as set forth in Part I.F. above, both that the law governing the lawfulness of Crossan's treatment of Kerman was not clearly established in October 1995 and that Crossan's conduct was objectively reasonable. *See Kerman III,* 2003 WL 328297, at *5–*8. We conclude that these rulings were foreclosed by *Kerman II* under the law-of-the-case doctrine and by the principles discussed above.

### 1. *The Law–of–the–Case Doctrine and Clearly Established Rights*

■ Under the law-of-the-case doctrine, " '[w]here a case has been decided by an appellate court and remanded, the court to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court.' " *United States v. Fernandez,* 506 F.2d 1200, 1202 (2d Cir.1974) (quoting 1B *Moore's Federal Practice* ¶ 0.404[10], at 571 (2d ed.1974) (footnotes omitted)); *see, e.g., Soto–Lopez v. New York City Civil Service Commission,* 840 F.2d 162, 167 (2d Cir.1988). "Where issues have been 'explicitly *or implicitly* decided on appeal,' ... the law-of-the-case doctrine obliges the district court on remand to follow the decision of the court of appeals ...." *Day v. Moscow,* 955 F.2d 807, 812 (2d Cir.) (quot-

ing *United States v. Uccio,* 940 F.2d 753, 758 (2d Cir.1991)) (emphasis ours), *cert. denied,* 506 U.S. 821, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992).

 Where the appellate court has decided a question of law, the lower court on remand lacks discretion to decide that question to the contrary. *See, e.g., In re Sanford Fork & Tool Co.,* 160 U.S. 247, 255, 16 S.Ct. 291, 40 L.Ed. 414 (1895); *Soto–Lopez v. New York City Civil Service Commission,* 840 F.2d at 167; *United States v. Fernandez,* 506 F.2d at 1202–03. Accordingly, when the court of appeals has remanded a case for trial after ruling that summary judgment in favor of a given party was inappropriate because the evidence indicated the existence of genuine issues of material fact to be resolved by the jury, the district court cannot properly, on remand, grant judgment as a matter of law to that party on the basis of trial evidence that is not substantially different. *See, e.g., Piesco v. Koch,* 12 F.3d 332, 341–42 (2d Cir.1993); *Doe v. New York City Department of Social Services,* 709 F.2d 782, 788–89 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *see also Wakefield v. Northern Telecom, Inc.,* 813 F.2d 535, 539–40 (2d Cir.1987) (reversing grant of summary judgment for the defendant after remand where, on first appeal, this Court had rejected the defendant's contention that it was entitled to judgment as a matter of law after trial, and no new material facts were adduced on remand), *abrogated on other grounds by Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). *See generally Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same'" (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))); *Piesco v. Koch,* 12 F.3d at 341 (as to "whether there are fact issues that should be decided only by the jury, the same standard that applies to a pretrial motion for summary judgment pursuant to Fed.R.Civ.P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50").

 In the prior appeal in the present case, we noted the well-established principle that, in order for a right to be clearly established, "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right,'" *Kerman II,* 261 F.3d at 236–37 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In *Glass v. Mayas,* a case decided before the events at issue here, involving physicians who took the plaintiff to a mental hospital against his will and confined him there pursuant to state law, we had noted that "'a State cannot constitutionally confine without more a *nondangerous* individual who is capable of surviving in freedom by himself or with the help of willing and responsible family members.'" 984 F.2d at 57 (quoting *O'Connor v. Donaldson,* 422 U.S. 563, 576, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)) (emphasis ours). In *Kerman II,* we reversed the *Kerman I* ruling that Crossan was entitled to summary judgment on grounds of qualified immunity on Kerman's unlawful seizure and false imprisonment claims for Kerman's involuntary hospitalization because we found that there were factual issues to be tried. Although we did not cite *Glass v. Mayas* in our analysis of Crossan's qualified immunity defense, in reversing the district court's ruling we necessarily rejected the proposition that Kerman's rights in October 1995

were not clearly established, for the matter of whether an asserted right was clearly established at the relevant time is a question of law. If Kerman's rights had not been clearly established, we would have affirmed the grant of summary judgment; there would have been no need for a trial.

In sum, in remanding for trial in *Kerman II*, we implicitly held that it was sufficiently clear in light of preexisting law that Kerman had a right not to be detained or involuntarily hospitalized by an officer who (on Kerman's version of the facts) did not know, and who patently ignored opportunities to determine, the seriousness of Kerman's condition and whether he was dangerous to himself or others. In light of the *Kerman II* decision, it was not open to the district court to decide on remand that that right was not clearly established.

### 2. *The Ruling of Objective Reasonableness as a Matter of Law*

Nor was it permissible for the district court to rule on remand as a matter of law that Crossan was entitled to qualified immunity on the basis that his conduct was objectively reasonable. Objective reasonableness is a mixed question of law and fact when, as here, material historical facts are in dispute. Thus, as discussed above, the district court's ruling that Crossan's conduct was objectively reasonable as a matter of law was foreclosed by *Kerman II* unless there was something new in the record on remand in the nature of "an undisputed fact [that] conclusively" required judgment in favor of Crossan, *Wakefield v. Northern Telecom, Inc.*, 813 F.2d at 540. We see in the record of the second trial no evidence that was materially different from the evidence before us in *Kerman II*.

Preliminarily, we note that in granting judgment as a matter of law despite *Kerman II*'s reversal of summary judgment, the district court quoted language in *Blissett v. Coughlin*, 66 F.3d 531 (2d Cir.1995), that "[w]here summary judgment is inappropriate, and the case proceeds to trial, the defense of qualified immunity may be presented to the jury or may be decided by the court in a motion for judgment as a matter of law." 66 F.3d at 538 (citing *Oliveira v. Mayer*, 23 F.3d at 649–50). *See Kerman III*, 2003 WL 328297, at *5. We take this opportunity to clarify the scope and context of the quoted *Blissett* statement. There are obviously common circumstances to which the *Blissett* statement is applicable, *i.e.*, cases where summary judgment is inappropriate because the party opposing the motion has adduced evidence sufficient to show a genuine issue of material fact to be tried, but where that party's proof as presented at trial falls short of its pretrial promise. In such circumstances, JMOL could become appropriate though summary judgment was not. *Blissett* did not purport to address the situation in which (a) the court of appeals has decided, prior to trial, that the defendant's qualified immunity defense cannot be decided on summary judgment, and (b) the evidence at trial was substantially the same as that proffered in opposition to summary judgment. Moreover, the district court in *Blissett* in fact had not decided the merits of the qualified immunity defense at all, but instead had found the defense waived. This Court affirmed that ruling, noting that

> because qualified immunity is an affirmative defense, it is incumbent upon the defendant to plead, *and adequately develop*, a qualified immunity defense during pretrial proceedings so that the trial court can determine which claims, if any, may be disposed of by summary judgment, or, at least, *which facts material*

*to the qualified immunity defense must be presented to the jury to determine its applicability once the case has gone to trial.*

66 F.3d at 538 (emphases added). In the same vein, in *Oliveira v. Mayer,* cited by *Blissett* for the proposition relied on in *Kerman III,* this Court reversed a grant of judgment as a matter of law, stating that

[t]he District Court should have let the jury (a) resolve the[ ] factual disputes and (b) based on its findings, decide whether it was objectively reasonable for the defendants to believe that they were acting within the bounds of the law when they detained the plaintiffs.

23 F.3d at 650. In short, neither *Blissett* nor *Oliveira* allows a district court to grant judgment as a matter of law on essentially the same record on which this Court has ruled that summary judgment is inappropriate because there exist factual issues that must be tried.

On this appeal, in an effort to bring the present case within the principle that a reversal of summary judgment in favor of a given party forecloses a grant of judgment as a matter of law to that party on remand unless on remand there is new evidence conclusively requiring judgment in that party's favor, Crossan argues that "[t]he facts plaintiff offered at the second trial differed from his prior description of events and conditions" (Crossan brief on appeal at 24) with respect to (a) the condition of Kerman's apartment and (b) the officers' obtaining information from Kerman's doctors. These arguments are not supported by the record.

As to the supposed difference in the evidence with respect to the condition of Kerman's apartment, Crossan argues that

[p]reviously, plaintiff contended that "his apartment was, at worst, untidy." *Kerman [II]*, 261 F.3d at 241. At the

second trial, plaintiff's description of his apartment more closely matched that of the officers. At the second trial, plaintiff said his apartment was messy, very disorganized, with papers and lots of unopened mail all over the table, clothing on the backs of chairs, magazines and newspapers on the floor as well as a large bag of cans ( [Tr.504] ). This is in addition to there being kitty litter and cat feces all over the foyer ( [Tr.122] ). The foregoing description of plaintiff's apartment, offered by plaintiff at the most recent trial, does not comport with the descriptive "untidy" which plaintiff foisted upon this Court.

(Crossan brief on appeal at 24–25.) Although Crossan is correct that at the second trial Kerman's testimony included these details as to the condition of his apartment, this was not Kerman's entire testimony, and we cannot view his testimony as materially different from his prior description of the apartment as untidy. As set forth in Part I.D. above, Kerman testified at the second trial that his apartment was merely "messy, but not dirty," stating, "I kept the kitchen clean. And I kept the bathroom immaculate . . . ." (Tr. 505) And any distinction between "untidy" and "messy" is at most a factual shading best left for evaluation by the jury; it surely is not a difference on which hinges the right to judgment as a matter of law.

As to Crossan's contention that the evidence at the second trial showed different facts as to the officers' attempts to obtain information from Kerman's doctors, Crossan states as follows:

[t]he record, *as developed at the second trial,* reflects that *the officers attempted to reach the psychiatrist plaintiff identified as his doctor* but that no one answered at the number plaintiff gave. The record also reflects that at plaintiff's request the officers called the num-

ber a second time and left a message ( [Tr.127–28] ). Later plaintiff gave the paramedic a different name and number of someone who plaintiff purported [*sic* ] was his doctor. *The paramedic called the number and held a conversation with the alleged doctor.* Thereafter, the paramedic held the phone up to the plaintiff so he could speak to the person at the other end. Although, under plaintiff's version of the facts, defendant Crossan hung up the phone while plaintiff was speaking with this second doctor, this allegedly occurred after *the trained medical professional conversed with the doctor. The paramedic was apparently satisfied with the information he received* as he did not ... call the doctor back ( [Tr.133–37] ). Under the law existing at the time of the incident, any *information the paramedic received can be imputed to defendant Crossan.*

(Crossan brief on appeal at 25 (emphases added).) Although the district court appears to have credited an argument such as this, implying that Pontrelli "received" medical "information" from Dr. Malone, *see Kerman III,* 2003 WL 328297, at \*7 ("paramedic Pontrelli asked Plaintiff who his psychiatrist was, and spoke to Dr. Malone" (citing Tr. 133–35)), the portions of the transcript referred to by the court and Crossan give no indication that Pontrelli had any conversation with Dr. Malone about Kerman's medical condition or history. Crossan has cited us to no evidence in the record sufficient to permit an inference that a conversation of that nature occurred, and our own review of the record persuades us that there is none to be found. According to Kerman, Pontrelli placed the call and, upon reaching Dr. Malone, said simply that Kerman was in custody and that no gun had been found. (*See* Tr. 133–34.) Pontrelli then held the phone to Kerman's ear to allow Kerman to speak with Dr. Malone. (*See* Tr. 134–35.) Before Kerman had finished speaking with Dr. Malone, Crossan grabbed the phone and hung up. (*See* Tr. 136–37; *see also id.* at 485.) Dr. Malone similarly testified that the paramedic who called him stated "that they were the paramedics, that everything was okay. There was no gun, and that Robert wanted to speak to me," and that the paramedic then allowed Kerman to speak to Dr. Malone. (Tr. 651.) Dr. Malone testified that the telephone was hung up in the middle of his ensuing conversation with Kerman. (*See* Tr. 652.) Pontrelli himself did not testify that he had any substantive conversation with Dr. Malone. Indeed, Pontrelli did not recall even placing the call. (*See* Tr. 579.) Thus, while Crossan argues that Pontrelli "was apparently satisfied with the information he received" and that the "information the paramedic received can be imputed to defendant Crossan" (Crossan brief on appeal at 25), there was no evidence that Pontrelli received any medical information whatever from any doctor, and hence no evidence of any such information that could have been relayed or imputed to Crossan.

Moreover, Crossan's suggestion that officer Hume's attempt to call Dr. Brozovsky was not known to this Court at the time of *Kerman II* is unsupportable. Although that fact was not mentioned in the opinion, it was argued in defendants' brief on that appeal. *See Kerman v. City of New York,* No. 00–9130, Appellees' Brief dated January 31, 2001, 2001 WL 34106425, at \*6 ("[Kerman] asked the officers why they did not call his psychiatrist, Dr. Brozovsky. An officer did so, leaving a message when the doctor did not answer the phone . . . .").

In sum, the evidence of the officers' efforts—or lack thereof—to obtain information from Kerman's doctors was not

significantly different in the second trial. Thus, the law-of-the-case doctrine precluded a ruling by the district court that Crossan's conduct was objectively reasonable as a matter of law.

### 3. The Court's Factual Findings as to Objective Reasonableness

■ In concluding that Crossan's conduct was objectively reasonable, the district court made a number of factual statements that were not findings by the jury and that impermissibly took the evidence in the light most favorable to Crossan, rather than, as required, to Kerman as the party in whose favor the jury found on the seizure and imprisonment claims and as the party against whom judgment was sought as a matter of law. *See generally Piesco v. Koch,* 12 F.3d at 343 (court may grant a motion for judgment as a matter of law "only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party"). As we have recognized,

> in most trials, and especially in one where participants are giving their accounts of events occurring rapidly and in a highly charged atmosphere, the jurors [a]re not required to accept the entirety of either side's account, but [a]re free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they credit[ ].

*Haywood v. Koehler,* 78 F.3d 101, 105 (2d Cir.1996). In determining whether to grant judgment as a matter of law, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. at 151. The district court in *Kerman III* did not limit its consideration to factual propositions that the jury in this case accepted or would have been compelled to accept.

For example, the court suggested that Crossan had directly obtained medical information from one of Kerman's doctors, stating that "[t]wo officers testified that they heard Defendant Crossan or another officer on the telephone with a doctor." *Kerman III,* 2003 WL 328297, at *7. Although officer Steve Kaminski said he saw Crossan on the telephone and believed Crossan addressed the person on the other end as "Doctor" (*see* Tr. 401–02), and officer Thomas Loomis said he saw either Crossan or Hume on the telephone and heard the person on the other end addressed as "Doc" (Tr. 452–53), neither of these officers could give any information whatever as to the substance of such a telephone conversation. Neither of them professed to have heard any questions being asked as to Kerman's medical history or condition. Moreover, even if the court could permissibly have inferred that Crossan had in fact spoken to one of Kerman's psychiatrists on the telephone, there was no evidence from which it could infer that either doctor had communicated to Crossan a belief that Kerman was then dangerous. Dr. Malone testified that Kerman, speaking with him on the telephone until they were cut off, sounded like his normal self, "coherent," "insightful," and "witty." (Tr. 662–63.) And Kerman's hospital record (which "the jury specifically asked to review during deliberations," *Kerman III,* 2003 WL 328297, at *4) showed that Dr. Brozovsky, who was contacted by the hospital no more than 1 ½ hours after Kerman's arrival, stated that Kerman's "homicidal ideation is 'infin[i]tesimal' and a 'minute' risk" (Trial Exhibit 1).

The jury surely was not required to credit the officers' testimony suggesting that Crossan spoke to a doctor, and their testimony was wholly insufficient to permit any inference as to the content or substance of any such conversation. The court, in crediting the officers' testimony and intimating that Crossan or another officer obtained medical information by speaking with a doctor on the telephone, plainly did not view the evidence in the light most favorable to Kerman, especially given (a) the inability of Crossan to recall speaking to any doctor, (b) the absence of any evidence that Dr. Brozovsky called the apartment, and (c) the testimony of Dr. Malone that he did not speak to a policeman.

Nor did the district court view the evidence in the light most favorable to Kerman in finding that Kerman "was conducting himself in a manner that was likely to result in serious harm to himself and others." *Kerman III*, 2003 WL 328297, at *7. The court having stated that it would disregard the defense testimony that Kerman was screaming and yelling, was incoherent, and would not calm down, *see id.*, the only supposedly dangerous conduct to which the court pointed was Kerman's "refusal to respond to questions or to allow a complete physical examination to be taken by EMS paramedic, Pontrelli," *id.* at *6. Yet the record contains evidence that Kerman did not refuse examination by Pontrelli and did not refuse to respond promptly and cogently to important questions. For example, Kerman testified that Pontrelli asked him whether he was taking any medication, and that he responded he was not. Further, when Hume asked Kerman whether he had a doctor, Kerman responded affirmatively and gave Hume Dr. Brozovsky's name and telephone number; and when Hume got no answer and hung up, it was Kerman who thought to have Hume call again and leave a message. In addi-

tion, Kerman testified that he allowed Pontrelli to take his pulse. When Pontrelli asked to take his blood pressure, Kerman "didn't refuse to allow him." (Tr. 477.) He simply responded, "you don't need to take my blood pressure. My blood pressure is one of the healthy things I have." (Tr. 132.) According to Kerman, Pontrelli did not pursue the matter. (*See* Tr. 477 ("If he had insisted I would have let him. But he didn't insist.").)

The court also concluded that Crossan's conduct was reasonable in part because Crossan observed that Kerman was naked. The jury, had it been asked, would not have been compelled to so conclude, given, *inter alia,* testimony by other officers that when they arrived at the apartment Kerman was wet and wearing a towel (*see, e.g.,* Tr. 382, 270), as well as Crossan's own testimony (a) that he would not have regarded nakedness in and of itself as an indication that Kerman was dangerous to himself or others, and (b) that he did not recall whether he asked Kerman why he was naked.

In addition, the court must have discredited testimony by Kerman when it found that Kerman's apartment "was filthy with feces and urine and stunk," *Kerman III,* 2003 WL 328297, at *7, and that "[t]he filthy conditions ... [were] admitted by Plaintiff," id.* at *6 (emphasis added). Although Kerman indicated that his apartment had been filthy in the past, he testified, as discussed above, that when the officers were there his apartment, though messy, was "not dirty," that the kitchen was "clean" and that the bathroom was "immaculate" (Tr. 505). In finding that Kerman's apartment was "filthy," the court improperly resolved a credibility issue in favor of Crossan; in finding that the condition of the apartment was sufficient to warrant a belief that Kerman posed a danger to himself or others, the court im-

properly drew inferences adverse to Kerman.

The district court also linked its finding that Crossan's conduct in sending Kerman to the hospital was objectively reasonable—and indeed was virtually required—to the New York statute that provides that " 'any . . . police officer . . . may take into custody any person who appears to be mentally ill and is conducting himself in a manner which is likely to result in serious harm to himself or others.' " *Kerman III*, 2003 WL 328297, at *6 (quoting N.Y. Mental Hygiene Law § 9.41). However, whether a person is conducting himself in a manner that is likely to result in serious harm to himself or others is a question of fact, and the court's instructions to the jury had repeatedly indicated that if the jury found that Kerman posed such a threat, whether overtly or as evidenced circumstantially by behavior, neglect, or refusal to care for himself (*see* Tr. 750, 755), it should find that Crossan had probable cause to detain Kerman and hospitalize him. Although the issues of probable cause and qualified immunity are not congruent, in that the latter requires consideration of the reasonableness of the defendant official's perception of the law, *see, e.g., Saucier v. Katz*, 533 U.S. at 205–06, 121 S.Ct. 2151, 150 L.Ed.2d 272; *Stephenson v. Doe*, 332 F.3d at 78–79, most of the factual components here, such as what actions were taken, what information the officers possessed as to Kerman's mental condition, and whether the officers' perceptions of the circumstances were reasonable in light of the information that was available to them, were common to both issues. The jury's finding that Crossan failed to show the existence of probable cause indicated its rejection of the proposition, embraced by the court, that "Crossan and his fellow police officers ascertained that Plaintiff . . . was conducting himself in a manner that was likely to result in seri-

ous harm to himself and others," *Kerman III*, 2003 WL 328297, at *7. In light of the jury's interrogatory answers, the court was not free to make this finding.

Nor can we uphold the district court's dismissal of Kerman's false imprisonment claims on the basis of the state-law provision granting police officers immunity from "damages for injuries alleged to have been sustained by [a] person [taken into custody and transported to a hospital] . . . unless it is established that such injuries . . . [were] caused by gross negligence." N.Y. Mental Hygiene Law § 9.59. *See generally Napolitano v. Flynn*, 949 F.2d 617, 620–21 (2d Cir.1991) (entitlement to immunity on state-law claims is a question of state substantive law). Citing *Woody v. Astoria General Hospital, Inc.*, 264 A.D.2d 318, 319, 694 N.Y.S.2d 41, 42 (1st Dep't 1999), for the proposition that "gross negligence" in § 9.59 means "reckless disregard" for the plaintiff's rights or "intentional wrongdoing," the district court held that "Crossan's actions do not rise to the level of gross negligence, i.e. reckless disregard or intentional wrongdoing." *Kerman III*, 2003 WL 328297, at *6. But questions as to whether there was gross negligence, intent, or reckless disregard are questions of fact to be answered by the jury. *See, e.g., Food Pageant, Inc. v. Consolidated Edison Co., Inc.*, 54 N.Y.2d 167, 172–73, 445 N.Y.S.2d 60, 62, 429 N.E.2d 738 (1981) ("the existence or non-existence of gross negligence . . . [is] a matter for jury determination."); *see also Rand & Paseka Manufacturing Co. v. Holmes Protection, Inc.*, 130 A.D.2d 429, 431, 515 N.Y.S.2d 468, 470 (1st Dep't 1987) (approving jury charge that "gross negligence occurs when a party proceeds in reckless disregard of the consequences of its acts"), *appeal denied*, 70 N.Y.2d 615, 524 N.Y.S.2d 677, 519 N.E.2d 623 (1988). In finding in favor of Crossan on these

issues, the district court stated that, "[a]s regards acts of reckless or intentional wrongdoing," the jury had found that Kerman failed to prove that "Crossan intentionally or recklessly subjected Plaintiff to *excess force* after he was placed in handcuffs" or that "Crossan's conduct amounted to *intentional infliction of emotional distress*," or that Crossan "*was motivated ... by Plaintiff's exercise of his free speech rights*" in keeping Kerman naked, refusing to allow him to medicate his cat, sending Kerman to the hospital, or sending him to Bellevue rather than a more convenient hospital. *Kerman III*, 2003 WL 328297, at *6 n. 6 (emphases added). Those jury findings, however, while pertinent to Kerman's claims of excessive force and retaliation, did not address the issue of whether Crossan's orders for Kerman's detention and hospitalization were grossly negligent with respect to, or in reckless disregard of, Kerman's right not to be detained or hospitalized without probable cause. As detailed in Part I.E. above, the only questions submitted to the jury on the issue of Crossan's conduct with respect to the claims of unlawful detention and false imprisonment were whether Crossan acted with probable cause. There was no jury finding as to whether Crossan acted with gross negligence as to, or in reckless disregard of, Kerman's right to liberty; and on the evidence taken in the light most favorable to Kerman (including the evidence that after the police search found no gun at Kerman's home, Crossan nonetheless ordered Kerman involuntarily hospitalized without availing himself of the opportunity to discuss Kerman's condition with Kerman's doctors), the jury would not have been compelled to find that Crossan was not reckless or grossly negligent. Thus, the court was not entitled to make that finding.

In sum, we agree with Kerman's contentions that the district court's ruling that Crossan was entitled to qualified immunity as a matter of law was contrary to the law of this case as established in *Kerman II*. And to the extent that the court's immunity rulings were based on the court's own factual findings that the jury neither made nor would have been compelled to make, the rulings infringed Kerman's Seventh Amendment right to have the facts found by a jury.

### 4. *Crossan's Obligation To Seek the Necessary Jury Findings*

■ Finally, we note that Kerman has argued that Crossan waived his qualified immunity defense by, *inter alia*, failing to move pursuant to Fed.R.Civ.P. 50(a) at trial for judgment as a matter of law and by failing to submit the necessary fact-specific questions to the jury. The district court concluded that Crossan had preserved his qualified immunity defense by, *inter alia*, pressing that issue during the jury deliberations at the first trial and moving for judgment as a matter of law prior to jury deliberations at the second trial. *Kerman III*, 2003 WL 328297, at *6 n. 7. These two rationales are untenable. The first trial concerned only claims of excessive force and battery; a qualified immunity argument made at that trial could not preserve a defense of qualified immunity to the (already dismissed) claim of unlawful seizure. And while the second trial did involve the reinstated seizure claims, defendants' JMOL motion, which is quoted in its entirety in Part I.E. above, addressed solely the merits of Kerman's claims under the First Amendment. As there was no mention of either qualified immunity or the Fourth Amendment, the JMOL motion did not preserve the defense at issue here.

Nonetheless, for the reasons that follow, we agree with the district court that Crossan did not waive his qualified immunity

defense by failing to make a Rule 50 motion prior to submission of the case to the jury. But we also agree with Kerman that the defense was effectively waived by Crossan's failure to request that the necessary predicate factual questions be submitted to the jury.

Rule 50(a) provides as follows:

(1) If during a trial by jury a party has been fully heard on an issue *and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue,* the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. *Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.*

Fed.R.Civ.P. 50(a) (emphases added). If the court does not grant such a motion during trial, the movant may "renew" the motion within 10 days after the entry of judgment. Fed.R.Civ.P. 50(b)

■ These provisions normally mean that a party is not allowed to move for judgment as a matter of law after trial without having made such a motion prior to submission of the case to the jury. *See, e.g., McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997). The purpose of Rule 50's requiring a pre-deliberations motion for JMOL is to alert the opposing party to the supposed deficiencies in his proof, *see, e.g., Galdieri–Ambrosini v. National Realty & Development Corp.,* 136 F.3d 276, 286–87 (2d Cir.1998); *Piesco v. Koch,* 12 F.3d at 340; *Baskin v. Hawley,* 807 F.2d 1120,

1134 (2d Cir.1986), thereby affording the nonmoving party "an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment," Fed.R.Civ.P. 50 Advisory Committee Note (1991); *see, e.g., Davis v. Rodriguez,* 364 F.3d 424, 432 (2d Cir.2004).

However, as indicated by the language of the Rule itself, a prerequisite for the granting of a Rule 50 motion is that "there [be] no legally sufficient evidentiary basis for a reasonable jury to find for th[e] party" against whom judgment as a matter of law is sought. Fed.R.Civ.P. 50(a)(1). As discussed in Part II.A.1., the standard for judgment as a matter of law is the same as the standard for summary judgment. Thus, when the court of appeals, on a prior appeal in the same case, has held that the evidence in the record is legally sufficient to prevent summary judgment in favor of a given party, that party is foreclosed from arguing that virtually the same evidence, presented at trial, is not legally sufficient to avoid judgment as a matter of law.

Rule 1 of the Federal Rules of Civil Procedure provides that the Rules "shall be construed and administered to secure just, speedy, and inexpensive determination" of actions. Fed.R.Civ.P. 1. In circumstances such as these, we cannot, consistent with Rule 1, construe Rule 50 to require a pre-deliberations motion for judgment as a matter of law. Such a motion would invite the trial court to commit error, for the motion could not properly be granted in light of the law-of-the-case doctrine; it thus hardly seems just to require that such a motion be made. Further, if the court granted the motion, disregarding the law of the case, a new trial (in this case, Kerman's third trial) would be required—hardly a just, speedy, or inexpensive course. Nor would it be expedi-

tious to require the movant to fashion a conditional pre-deliberations motion for JMOL where there are multiple material factual disputes, for the permutations of possible findings could easily become unwieldy. Here, for example, the disputes pertinent to Crossan's qualified immunity defense included (1) whether Crossan hung up on Dr. Malone, bypassing the opportunity to get a medical opinion on Kerman's condition (2) whether Crossan talked to any doctor, (3) whether Pontrelli had any conversation with Dr. Malone about Kerman's condition, (4) whether Kerman refused to respond to questions, (5) whether Kerman's emotional state exhibited dangerousness, and (6) whether the condition of his apartment suggested dangerousness. A conditional Rule 50 motion hypothesizing favorable (to Crossan) jury answers to one or more of these questions would have entailed analysis of more than a score of possible combinations.

■ We conclude that when the law-of-the-case doctrine precludes the granting of a motion for judgment as a matter of law on a given issue prior to submission of the case to the jury because the appellate court has held, on substantially the same evidentiary record, that as to that issue there are questions of fact that must be resolved by the jury, it would be inappropriate to conclude that a party's failure to make such a motion prior to submission of the case to the jury constituted a waiver of its right to request judgment in its favor after the jury has returned a verdict and has resolved the pertinent factual disputes in its favor. Here, where the record at trial was virtually the same as the record before this Court in *Kerman II, see* Part II.A.2. above, judgment as a matter of law prior to jury findings of fact was precluded by our decision in *Kerman II,* and we thus reject the contention that Crossan waived

his defense by failing to make a motion for the forbidden relief.

This conclusion does not, however, mean that there was not a waiver of a different sort, for Crossan, who had the burden of proving his defense of qualified immunity, failed to ask that the jury be given interrogatories that were sufficiently specific to permit it to resolve the factual disputes that were material to his defense. Although, as discussed in Part II.A. above, the ultimate question of whether a defendant official is entitled to qualified immunity is one for the court, when the relevant factual disputes have been resolved by a jury the court must base its legal ruling on the facts as found by the jury. In *Kerman II* we observed that "a finding that the officers violated the Constitution does not necessarily prevent the application of qualified immunity," 261 F.3d at 240; that "[o]nce the outstanding factual questions are answered," the court could decide whether, even if Crossan violated the Fourth Amendment, "he is nevertheless entitled to qualified immunity," *id.* at 241; and that "a jury should decide what transpired between the officers and Kerman," *id.*

At the new trial, however, no precise questions as to the actual events and circumstances were submitted to the jury. As described in Part I.E. above, Crossan pursued his qualified immunity defense simply by requesting that the jury be asked to make a finding as to whether his decision to detain and hospitalize Kerman was supported by probable cause. The district court likewise, in colloquy with counsel, identified the only factual question to be put to the jury on Crossan's qualified immunity defense as whether Crossan had "[p]robable cause to send [Kerman] to the hospital." (Tr. 465.) Accordingly, the court gave no other instruction with respect to qualified immunity.

The jury was asked, in accordance with Fed.R.Civ.P. 49(b), to answer the 17 interrogatories described in Part I.E. above and to return a "general verdict" (Tr. 765; *see also id.* at 729, 734). Those interrogatories, which were "approved by both sides[']' counsel," *Kerman III,* 2003 WL 328297, at *2, made no distinction between Crossan's position as to immunity on the seizure and false imprisonment claims and his position as to the merits of those claims. Thus, the interrogatories did not ask, for example, whether Kerman appeared to be mentally unstable, whether his apartment was filthy or merely messy, whether Pontrelli obtained any medical information from Dr. Malone, whether Crossan himself obtained information about Kerman's condition by conversing with a doctor, or whether Crossan hung up on Dr. Malone and thereby knowingly or recklessly bypassed an opportunity to obtain expert information as to whether Kerman posed a danger to himself or others.

Although subpart (a) of Rule 49 permits the trial court, in some circumstances, to supply an omitted finding that would complete a jury's verdict, *see, e.g.,* 9 *Moore's Federal Practice* § 49.11[4], at 49–32 (3d ed.2003), Rule 49(a) does not apply where the jury, in accordance with Rule 49(b), has returned a general verdict, making a finding as to ultimate liability, *see, e.g., Jarvis v. Ford Motor Co.,* 283 F.3d 33, 56 (2d Cir.), *cert. denied,* 537 U.S. 1019, 123 S.Ct. 539, 154 L.Ed.2d 427 (2002). Here, having requested and received from the jury a general verdict, and having asked, with respect to the immunity defenses, only whether Crossan had probable cause, the court was not permitted to make findings as to other facts.

In the circumstances of this litigation, if the requisite fact questions had been submitted to the jury, and if the jury had answered them favorably to Crossan, the district court would then have had the authority, despite the absence of a Rule 50 motion, to make the ultimate legal determination of whether Crossan was entitled to qualified immunity on the Fourth Amendment claim, or whether there was privilege on the state-law claims, based on the jury's factual findings. To the extent that a particular finding of fact was essential to an affirmative defense, however, it was incumbent on Crossan to request that the jury be asked the pertinent question. Not having made such a request, Crossan was not entitled to have the court, in lieu of the jury, make the finding. The material factual issues as to Crossan's defenses not having been resolved by the jury, we reverse the district court's ruling that Crossan's decision to detain and hospitalize Kerman was protected by privilege or qualified immunity.

## B. *Kerman's Entitlement to Correction of the Judgment*

The April 23, 2002 judgment entered by the district court after the jury returned its verdict dismissed all of Kerman's claims. The court ruled in *Kerman III* that Kerman's Rule 60 motion, seeking correction of the judgment to reflect that he prevailed on his Fourth Amendment claim for unlawful seizure and his state-law claims for false imprisonment, had merit despite a possible inconsistency in the jury's answers to the interrogatories. We agree.

 With respect to those claims, the jury had been instructed that it should not find Crossan liable for Kerman's injuries unless it found that Crossan acted without probable cause and proximately caused the injuries to which Kerman testified. The jury found that Crossan had detained Kerman and ordered him taken to the hospital without probable cause but that Kerman had not proven that that unlawful conduct

was the proximate cause of his claimed injuries. The jury nonetheless concluded that Kerman should be awarded nominal damages. Because the jury had been instructed that it should not reach the issue of damages unless it found that Kerman had established Crossan's liability, there appeared to be some tension between its finding that Kerman had not shown proximate cause and its finding that he was entitled to nominal damages. Where there appears to be an inconsistency between the jury's interrogatory answers, "[i]t is the duty of the district court to reconcile the jury's general verdict and its interrogatory responses if reasonable reconciliation is possible." 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2513, at 229 (2d ed.1995). Such a reconciliation may take into account a perhaps-flawed aspect of the instructions that the jury may have followed. *See, e.g., Abou–Khadra v. Mahshie,* 4 F.3d 1071, 1078 (2d Cir.1993). Given the parties' Seventh Amendment right to a jury trial, "[w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962); *see, e.g., Schaafsma v. Morin Vermont Corp.,* 802 F.2d 629, 634–35 (2d Cir. 1986).

Applying this principle, the district court properly reconciled any apparent inconsistency between the jury's finding that Kerman was entitled to nominal damages and its finding that Crossan's conduct did not proximately cause Kerman injury. The court had instructed the jury on the need to find proximate cause only in the context of the court's discussion of compensatory damages (*see* Tr. 759–60), and in that category of damages the court had referred only to "medical expenses," "physical pain and suffering," and "emotional and mental

anguish" (Tr. 760–61). As to nominal damages, in contrast, the court instructed that the jury could make such an award if it found that, other than the deprivation of a legal right, Kerman had "suffered no actual damages" (Tr. 761), presumably referring to the medical expenses, pain and suffering, and emotional distress for which the court had instructed that Kerman might recover compensatory damages.

■■■ In reconciling the jury's answers, the court reasoned that the jury had found a violation of Kerman's rights but simply had "found that ... Plaintiff had suffered no actual damages"; and, citing *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the court concluded that Kerman was entitled to an award of nominal damages because he had established that Crossan's conduct violated his constitutional rights. *See Kerman III,* 2003 WL 328297, at *3 (internal quotation marks omitted). In light of the instructions, the district court properly ruled that the jury's interrogatory answers were consistent. And in light of an individual's right to be free of official physical restraint in the absence of probable cause, the district court correctly concluded that, on the basis of the jury's findings, Kerman had prevailed on his Fourth Amendment claim for unlawful seizure and his state-law claims for false imprisonment.

C. *Kerman's Entitlement to a New Trial on Damages*

In his posttrial Rule 59 motion, Kerman contended that in light of the fact that he had prevailed on the unlawful seizure and false imprisonment claims, he was entitled to an award of more than nominal damages. He moved for a new trial on damages, contending that the jury's verdict was against the weight of the evidence. He also argued that given the undisputed

evidence that he had been held in custody for some 24 hours, he was entitled to at least compensatory damages as a matter of law because "[t]he right involved here— to be free from unlawful seizures—is the right to liberty.... The jury in this case found that defendant Crossan violated Kerman's right to liberty." (Plaintiff's Memorandum in Support of Motion to Correct the Judgment and for a New Trial on the Issue of Damages at 3–4.) Kerman argued that the denial of any compensatory damages constituted "a serious error or miscarriage of justice." (*Id.* at 3.) He also argued that he had proven substantial injuries including pain, suffering, posttraumatic stress disorder, and deterioration of his preexisting psychological condition. (*See, e.g., id.* at 4, 7; Declaration of Gregory Abbey (Kerman's attorney) dated April 30, 2002.)

The district court denied Kerman's Rule 59 motion on various grounds. The court stated that the jury found that Kerman had not suffered actual damage as a result of Crossan's actions, *see, e.g., Kerman III,* 2003 WL 328297, at *3, and that that finding was supported by the record, *see id.* at *4. In addition, the court found that Kerman's stay at the hospital overnight could not be attributed to Crossan, given that "[t]he doctors at Bellevue, following an interview with Plaintiff upon his arrival ... and following telephone discussions with ... Dr. Brozovsky, and with ... Dr. Malone, determined (with Plaintiff's consent) to keep Plaintiff overnight for observation," *id.* at *4. The court also stated that "the jury could have rationally concluded that, although Defendant Crossan had not proved that he had adequate grounds to cause Plaintiff to be brought to the hospital, that decision was in Plaintiff's best interests and did not result in injury to him." *Id.* at *3.

On appeal, Kerman contends (1) that the jury's denial of compensatory damages was against the weight of the evidence, and (2) that the court misapplied the pertinent legal principles. We bypass Kerman's first contention because a district court's denial of a new trial motion made on the ground that the jury's verdict was against the weight of the evidence is not reviewable on appeal, *see, e.g., Robinson v. Cattaraugus County,* 147 F.3d 153, 160 (2d Cir.1998); *Haywood v. Koehler,* 78 F.3d at 104; *Stonewall Insurance Co. v. Asbestos Claims Management Corp.,* 73 F.3d 1178, 1199 & n. 13 (1995), *modified on other grounds,* 85 F.3d 49 (2d Cir.1996). However, Kerman's second contention is properly before us:

> [W]e may ... review the [denial of a new-trial motion] to the extent that it rejected the related contention that the undisputed evidence entitled [the plaintiff] to a compensatory award as a matter of law. *See, e.g., Wheatley v. Beetar,* 637 F.2d 863, 865 (2d Cir.1980). A trial court's ruling rejecting a claim that an issue should have been decided in favor of a party as a matter of law is invariably reviewable on appeal from a final judgment. *See Calamia v. City of New York,* 879 F.2d 1025, 1030–31 (2d Cir. 1989).

*Haywood v. Koehler,* 78 F.3d at 104; *see, e.g., Atkins v. New York City,* 143 F.3d 100, 104 (2d Cir.1998).

In addressing Kerman's contention that he should have a new trial on damages because he was entitled to compensation as a matter of law, we view the record in the light most favorable to Crossan as the party against whom a new trial is sought. *See, e.g., Amato v. City of Saratoga Springs,* 170 F.3d 311, 314 (2d Cir.1999); *Atkins v. City of New York,* 143 F.3d at 102; *Wheatley v. Beetar,* 637 F.2d 863, 865 (2d Cir.1980). Taking the record in that

light, we conclude that Kerman is not entitled to a new trial with respect to damages for his claimed physical pain, mental suffering, humiliation, psychological deterioration, and medical expenses, but that he should have been granted a new trial with respect to damages for his loss of liberty.

### 1. *Kerman's Claims of Physical, Mental, and Emotional Injury*

█ A finding that the plaintiff has been deprived of a constitutional right does not automatically entitle him to a substantial award of damages. "The cardinal principle of damages in Anglo-American law," which applies to actions brought under § 1983, "is that of *compensation* for the injury caused to plaintiff by defendant's breach of duty." *Carey v. Piphus,* 435 U.S. at 254–55, 98 S.Ct. 1042 (emphasis in original). For example, when a defendant has deprived the plaintiff of liberty or property without affording him a hearing as required by the Due Process Clause, but the defendant proves that the adverse action would have been taken even if a proper and timely hearing had been held, the plaintiff has not proved compensable injury and is entitled only to nominal damages. *See id.* at 260–63, 98 S.Ct. 1042. *See also Robinson v. Cattaraugus County,* 147 F.3d at 162 ("If a jury finds that a constitutional violation has been proven but that the plaintiff has not shown injury sufficient to warrant an award of compensatory damages, the plaintiff is entitled to an award of at least nominal damages as a matter of law.... The jury should be so instructed, and we have held that it is plain error to instruct the jury merely that, having found a violation, it 'may' [rather than must] award nominal damages.").

Similarly, when a jury has found that the plaintiff proved a defendant used excessive force against him in violation of his rights under the Fourth or Fifth Amendment, a verdict that the plaintiff is not entitled to compensatory damages is not necessarily impermissible. A jury could reasonably find that only nominal damages are appropriate where, for example, a plaintiff's testimony as to his injuries lacks objective support or credibility, or where both justified force and unjustified force were used, either of which could have caused his injuries, or where some of the plaintiff's injuries could have been caused by a codefendant who was not found to have used excessive force. *See, e.g., Amato v. City of Saratoga Springs,* 170 F.3d at 315; *Haywood v. Koehler,* 78 F.3d at 104–05; *Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994).

█ In light of these principles, we cannot conclude that Kerman is entitled to a new trial on damages for most of his claimed injuries. The injuries to which he testified were relatively minor physical injuries (pain from being transported with his hands cuffed under him and subsequent soreness in his back and neck) and emotional or psychological injuries. Taking the evidence in the light most favorable to Crossan, as the party against whom a new trial is sought, we see no valid reason why the jury could not have rejected these claims of injury. The jury could, for example, have found that any physical pain Kerman suffered was de minimis in light of both the hospital record that described him as arriving at Bellevue "in no apparent physical distress" (Trial Exhibit 1) and Kerman's own trial testimony that, after leaving Bellevue, he did not seek medical treatment for any physical injuries (Tr. 495, 510–12).

As to whether Kerman experienced mental suffering or psychological injury, the jury was not required to credit Kerman's subjective representations or the testimony of Kerman's brother, who, like Kerman, was an interested witness. Fur-

ther, although Kerman presented a psychiatrist's expert opinion that he suffered posttraumatic stress disorder as a result of "the incident with the police" (Tr. 308), that opinion was not sufficiently specific to link that disorder to conduct for which Crossan could be held liable. The "incident" had begun with the officers' forcible entry into Kerman's apartment and immediate seizure of Kerman in preparation for their search for a gun. But at the second trial, only the postsearch stage of the event was at issue, as we had held in *Kerman II* that Crossan had immunity with respect to the entry and initial seizure. *See* 261 F.3d at 237–38. The psychiatrist's testimony did not link any of Kerman's claimed injuries to the stage of the incident that followed the officers' completion of their search for a gun, and the jury could permissibly have concluded that any adverse mental, emotional, or psychological effects Kerman experienced resulted from the shock of the officers' entry and the initial seizure. With regard to the postsearch period, the jury could have been persuaded that Kerman suffered no more than minimal psychic or emotional damage, given, *inter alia*, Kerman's testimony that although he was shocked by the entry and presence of the policemen, he became relatively calm, and Dr. Malone's testimony that, in the postsearch period, Kerman was "witty."

Accordingly, we cannot conclude that Kerman was entitled as a matter of law to compensatory damages on the basis of his claims of physical pain, medical expenses, emotional suffering, and psychological injuries.

### 2. *Kerman's Claim of Loss of Liberty*

■ In contrast, where the jury has found a constitutional violation and there is no genuine dispute that the violation resulted in some injury to the plaintiff, the plaintiff is entitled to an award of compensatory damages as a matter of law. *See, e.g., Atkins v. City of New York,* 143 F.3d at 103; *Haywood v. Koehler,* 78 F.3d at 104; *Raysor v. Port Authority of New York and New Jersey,* 768 F.2d 34, 39 (2d Cir.1985), *cert. denied,* 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337 (1986); *Wheatley v. Beetar,* 637 F.2d at 867. In *Wheatley,* for example, a bifurcated trial was held on the plaintiff's claim that he had been beaten by county police officers. In the first phase of the trial, the jury found the defendants liable for use of excessive force in violation of the plaintiff's constitutional rights; in the second phase, the jury awarded damages of just $1. The plaintiff moved unsuccessfully for a new trial on the issue of damages. On appeal, we reversed. We noted that although the jury could reasonably have rejected some of the plaintiff's evidence of injury, other injury claims were well substantiated and uncontradicted. Since the jury's verdict that excessive force had been used plainly accepted the plaintiff's testimony that he had been beaten, we concluded that the plaintiff was entitled as a matter of law to some compensation. *See* 637 F.2d at 865. Thus, we held that in the second phase of the trial, "[i]t was error to charge the jury that an award of nominal damages was permissible and an abuse of discretion not to set [such an award] aside." *Id.*

Similarly, where the plaintiff was indisputably deprived of his liberty, and the conduct of the defendant responsible for the deprivation was found to be unlawful, we have held that the plaintiff is entitled to compensatory, not merely nominal, damages. *See Raysor v. Port Authority of New York and New Jersey,* 768 F.2d at 38–39 ("*Raysor*"). In *Raysor,* the plaintiff, while attempting to return approximately $16 worth of pills to a store, was arrested and was detained for several hours. Following his exoneration, he

brought suit under § 1983 and state law for false arrest and malicious prosecution. The jury found against him on the constitutional claims but found one defendant liable on the state-law claims; it awarded the plaintiff compensatory damages of $16. We held that this award was inadequate to compensate the plaintiff for, *inter alia,* "the loss of time ... involved in a case of false arrest." 768 F.2d at 39 (internal quotation marks omitted). We noted that

> New York cases uphold awards of up to $10,000 for eve[n] short periods of confinement without proof of actual damages. *See, e.g., Hallenbeck v. City of Albany,* 99 A.D.2d 639, 472 N.Y.S.2d 187 (1984) ($10,000 for three hours); *Woodard v. City of Albany,* 81 A.D.2d 947, 439 N.Y.S.2d 701 (1981) ($7,500 for five hours); *Guion v. Associated Dry Goods Corp.,* 56 A.D.2d 798, 393 N.Y.S.2d 8 (1977) ($10,000 for three hours), *aff'd,* 43 N.Y.2d 876, 403 N.Y.S.2d 465, 374 N.E.2d 364 (1978).

*Raysor,* 768 F.2d at 39. We inferred that the inadequate verdict was likely the product of a jury charge that did not inform the jury that the plaintiff was entitled to recover for the loss of intangible rights:

> The admonition not to award "speculative damages" was, of course, correct, as was the court's instruction that Raysor had "the burden of proof with respect to the nature and extent of his injuries, and with respect to his resulting losses." *But the court should have made it clear to the jury that it could award monetary damages—the amount necessarily arbitrary and unprovable—for the intangibles which we have referred to above.*

*Id.* (emphasis added).

*Raysor* is consistent with traditional common-law principles governing entitlement to damages for the tort of false imprisonment. That tort "is complete with even a brief restraint of the plaintiff's freedom"; "it is not necessary that any damage result from it other than the confinement itself." Prosser & Keeton, *The Law of Torts* § 11, at 48 (5th ed. 1984) ("Prosser & Keeton"). The compensatory damages that may be awarded for false imprisonment fall into two categories: general damages and special damages. *See, e.g.,* McCormick, *Handbook on the Law of Damages* § 107, at 375–77 (1935) ("*McCormick on Damages* "). General damage is a "harm of a sort inseparable from [the unlawful] restraint." *Id.* at 375. For "false imprisonment, upon pleading and proving merely the unlawful interference with his liberty, the plaintiff is entitled to 'general' damages for loss of time and humiliation or mental suffering." *Id.; see, e.g., Prosser & Keeton* § 11, at 48 ("The plaintiff is entitled to compensation for loss of time, for physical discomfort or inconvenience, and for any resulting physical illness or injury to health. Since the injury is in large part a mental one, the plaintiff is entitled to damages for mental suffering, humiliation, and the like." (footnotes omitted)). Items of "special damage" commonly include "physical discomfort, shock, or injury to health," "loss of ... employment," and "injury to the plaintiff's reputation or credit," and must be specifically pleaded and proven. *McCormick on Damages* at 376. In contrast, " '[g]eneral' damage ... need not be specifically proved-it may be inferred from the circumstances of the arrest or imprisonment" and "would include at least the value of the time lost by the plaintiff during the period of detention." *Id.*

The damages recoverable for loss of liberty for the period spent in a wrongful confinement are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering; even absent such other injuries,

an award of several thousand dollars may be appropriate simply for several hours' loss of liberty. *See, e.g., Hallenbeck v. City of Albany,* 99 A.D.2d 639, 472 N.Y.S.2d 187 (3d Dep't 1984); *Woodard v. City of Albany,* 81 A.D.2d 947, 439 N.Y.S.2d 701 (3d Dep't 1981). In *Woodard,* for example, the Appellate Division held that a plaintiff who provided "no indication that he incurred any substantial physical or mental injury as the result of [his] false imprisonment" could recover $7,500 for false arrest and false imprisonment. 81 A.D.2d at 947, 439 N.Y.S.2d at 702 (ordering a new trial on damages unless the plaintiff agreed to a remittitur of a $16,000 jury award to $7,500, the "plaintiff [having] only spent approximately five hours in jail"). Similarly, in *Hallenbeck,* where the plaintiff had provided "no indication that he incurred any substantial physical or mental suffering," the Appellate Division ruled that he could recover $10,000 for false arrest and confinement. 99 A.D.2d at 640, 472 N.Y.S.2d at 189 (ordering remittitur of a $25,000 jury award to $10,000 where the "plaintiff was detained three hours"). *See also Gardner v. Federated Department Stores, Inc.,* 907 F.2d 1348 (2d Cir.1990) (requiring remittitur of a $150,000 jury award to $50,000 for loss of liberty, and approving other awards for past and future pain and suffering). Thus, a verdict that a plaintiff should not receive more than nominal damages for physical injury, economic loss, or mental suffering does not foreclose a more substantial award for his loss of liberty.

In the present case, the facts with regard to Kerman's actual loss of liberty were largely uncontroverted. There was no dispute that Kerman was kept in handcuffs after the officers completed their search for a gun and that he was taken to Bellevue Hospital where he remained overnight; there was no dispute that Crossan was in charge of the group of officers who kept Kerman in custody; there was no dispute that it was Crossan who ordered that Kerman be taken to the hospital (*see, e.g.,* Tr. 524 (Crossan admits that he "made the decision to remove [Kerman] from his home and send him to the hospital"); Tr. 750 (instructing the jury that "[i]t is not disputed by the parties that the defendant Crossan decided that plaintiff would be brought to the hospital")); and there was no dispute that Kerman did not go to the hospital willingly.

The jury, however, was not instructed that Kerman was entitled to compensatory damages for his loss of liberty. This may have been attributable in part to the district court's view, stated in its posttrial discussion of the jury's failure to return a verdict for more than nominal damages, that Crossan could not be held responsible for any loss of liberty after Kerman's arrival at Bellevue. The court stated, *inter alia,* that Kerman's detention in the hospital was not attributable to Crossan but rather was based on the independent decision of the Bellevue doctors. *See Kerman III,* 2003 WL 328297, at *4. That view, however, is contrary to the principle that "tort defendants, including those sued under § 1983, are 'responsible for the natural consequences of [their] actions,'" *Warner v. Orange County Department of Probation,* 115 F.3d 1068, 1071 (2d Cir.1997) (quoting *Malley v. Briggs,* 475 U.S. 335, 344 n. 7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986))(other internal quotation marks omitted). Thus, "an actor may be held liable for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties." *Warner v. Orange County Department of Probation,* 115 F.3d at 1071 (internal quotation marks omitted); *see also Herzog v. Village of Winnetka,* 309 F.3d 1041, 1044 (7th Cir. 2002); *Woodling v. Garrett Corp.,* 813

F.2d 543, 556 (2d Cir.1987). The fact that the intervening third party may exercise independent judgment in determining whether to follow a course of action recommended by the defendant does not make acceptance of the recommendation unforeseeable or relieve the defendant of responsibility. *See, e.g., Malley v. Briggs,* 475 U.S. at 338–39, 344 n. 7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (a judge's decision to issue an arrest warrant does not break the causal chain between an officer's improvident application for the warrant and the ensuing arrest); *Warner v. Orange County Department of Probation,* 115 F.3d at 1073 & n. 4 (probation department may be held liable for recommending a probationary program that was unconstitutional, notwithstanding the fact that the sentencing judge made his own determination as to whether to accept the recommendation).

Although foreseeability is normally an issue of fact, *see, e.g., Warner v. Orange County Department of Probation,* 115 F.3d at 1073; *Woodling v. Garrett Corp.,* 813 F.2d at 556; *Restatement (Second) of Torts* § 453 comment *b* (1965), it is unquestionable here that Kerman's detention in the hospital for some period of time was a foreseeable consequence of Crossan's sending him there. Crossan has contended throughout that he ordered Kerman taken to the hospital on the premise that Kerman, if left at large, was a danger to himself or others; accordingly, the Bellevue intake record stated that Kerman was "Brought by NYPD as possible suicide attempt" and "B/B [brought by] NYPD as EDP with threats to kill therapist & self" (Trial Exhibit 1). Consistent with his premise that Kerman was dangerous, Crossan urged the district court to instruct the jury to determine whether Crossan had probable cause "to keep [Kerman] in protective custody and send [him] to the hospital *for observation* " (Defendants' Re-

quested Charge to the Jury at 6 (emphasis added)), and it would be irrational not to infer that Crossan intended that Kerman be kept at the hospital for a period sufficient to permit observation leading to a determination of whether Kerman was likely a danger to himself or others. No rational factfinder could fail to find that it was foreseeable to Crossan that his sending Kerman to the hospital for evaluation as whether he was suicidal or homicidal would result in Kerman's detention in the hospital for some period of time. Accordingly, we reject the district court's view that Crossan could not be held responsible for any of the period during which Kerman was detained at Bellevue.

The district court also found that Crossan was not responsible for Kerman's remaining at Bellevue overnight because it found that Kerman "consent[ed]" to remaining there overnight. *Kerman III,* 2003 WL 328297, at *4. This finding was based on a notation in the hospital record stating that "Pt. [patient] does not want to stay in hosp., however agrees to stay o.n. [overnight] for reeval tom. [tomorrow]." (Trial Exhibit 1.) Although we have seen in the record no testimony indicating that Kerman agreed to remain in the hospital overnight, and although Kerman testified that in the hospital he was made to feel like a prisoner, a jury could choose to credit instead this hospital record notation that he consented to stay overnight. However, the hospital record itself indicates that that notation was made at 11 p.m., and there is no indication of any earlier consent. Thus, given that Crossan caused Kerman to be taken the hospital for evaluation at approximately 1 p.m. and that there is no evidence whatever of any consent by Kerman prior to 11 p.m., the evidence at the second trial, even taken in the light most favorable to Crossan, established that Crossan caused Kerman's loss

of liberty without probable cause for at least 10 hours.

The district court also hypothesized that the jury might "have rationally concluded that, although Defendant Crossan had not proved that he had adequate grounds to cause Plaintiff to be brought to the hospital, that decision was in Plaintiff's best interests and did not result in injury to him." *Kerman III*, 2003 WL 328297, at *3. We cannot view this as a permissible interpretation of the jury's verdict. If the court had instructed the jury that Crossan, without probable cause to believe that Kerman posed a danger to himself or others, was entitled to deprive Kerman of his liberty simply on the basis that hospitalization was in Kerman's "best interests," that instruction would obviously have been erroneous. It would have been impermissible for Crossan to deprive Kerman of his liberty solely on such a "best interests" premise, and it would have been no more permissible for the jury to rely on such a premise in denying Kerman compensation to which he was entitled as a matter of law. We cannot endorse this hypothesis as an acceptable explanation for the jury's failure to award compensatory damages.

Instead, the record suggests to us that the jury's failure to award Kerman compensatory damages resulted from the way in which the jury was instructed on the issue of damages. In describing injury and compensatory damages, the court focused solely on Kerman's claims of medical expenses, physical pain, and mental or emotional suffering. (*See, e.g.*, Tr. 760–61; *see also id.* at 760 ("right to recover damages is not limited by the fact that his injury resulted from an aggravation of a preexisting condition").) The court's instructions gave no indication that if the jury found that Crossan detained Kerman and sent him to the hospital without probable cause, which necessarily curtailed Kerman's liberty, Kerman was, independently of his claims of physical, mental, emotional, or economic injury, entitled to be compensated for that loss of liberty. The jury should have been so instructed.

■ Although Kerman argued after trial that he was entitled to compensatory damages for his loss of liberty, we see in the record no indication that he objected at trial to the court's failure to give the jury such an instruction. Absent an objection prior to the submission of the case to the jury, a claimed error in instructions is not preserved for normal appellate review, *see* Fed.R.Civ.P. 51, and, in a civil case, is reviewable only for fundamental error. "To qualify as a fundamental error a jury charge must have deprived the jury of adequate legal guidance to reach a rational decision." *De Falco v. Bernas*, 244 F.3d 286, 312 n. 16 (2d Cir.2001) (internal quotation marks omitted); *see, e.g., Jarvis v. Ford Motor Co.*, 283 F.3d at 62; *Travelers Indemnity Co. v. Scor Reinsurance Co.*, 62 F.3d 74, 79 (2d Cir.1995); *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1026 (2d Cir. 1991).

In *Raysor*, although we did not discuss this principle, we treated the trial court's failure to instruct the jury as to the plaintiff's entitlement to compensatory damages for loss of liberty as an error that was fundamental. The *Raysor* panel noted that Raysor had been incarcerated "for several hours—he said five and Officer Simpson said three and one-half." 768 F.2d at 37. Although the record suggested that Raysor's time might have had little economic value, given his testimony that at the time of his arrest he was a law-school dropout receiving disability benefits (*see Raysor v. Port Authority of New York and New Jersey*, 81 Civ. 3808 (S.D.N.Y. June 6, 1984) Trial Transcript at 37), we ruled that an award of $16 was entirely inadequate to

compensate Raysor for, *inter alia*, "the loss of time ... involved in a case of false arrest," *Raysor*, 768 F.2d at 39 (internal quotation marks omitted). As discussed above, we stated that "the court should have made it clear to the jury that it could award monetary damages—the amount necessarily arbitrary and unprovable—for the intangibles which we have referred to above," 768 F.2d at 39, and we inferred that the inadequate verdict likely resulted from the failure of the instructions to inform the jury that the plaintiff was entitled to recover for such intangibles as the loss of time.

The official appellees in *Raysor* argued that any such instructional error was waived because Raysor had not objected at trial to the court's failure to give that instruction. (*See* brief on appeal of defendant Port Authority, *et al.*, at 16–17 ("[A]ppellant cannot complain about any alleged errors in the District Court's charge on the issue of damages, since he not only failed to address the issue of damages in his proposed jury instructions, but also failed to specifically call such alleged errors to the trial court's attention where they could have easily been corrected.").) Despite Raysor's failure to preserve the instructional error for normal appellate review, we concluded that the court's failure to instruct the jury that Raysor was entitled to compensation for a loss that was inseparable from the restraint itself was sufficiently serious to require a new trial before a jury properly instructed that Raysor could be compensated for loss of his liberty.

██ In the present case, where there was no dispute that Crossan caused the postsearch curtailment of Kerman's liberty, and where that loss of liberty indisputably lasted at least 10 hours without any evidence of Kerman's consent, the trial court should have informed the jury that if it found Crossan acted without probable cause it should award Kerman compensation for the loss of his liberty. Given that a loss of liberty is inherent in an unlawful confinement, the failure to give that instruction deprived the jury of the legal guidance needed for a rational decision and thus constituted fundamental error.

The dissent disagrees with our view that it was fundamental error for the trial court to fail to instruct the jury that, upon finding that Crossan unlawfully deprived Kerman of his liberty, the jury could award Kerman compensatory damages for that loss of liberty. The dissent suggests principally that Kerman's failure to request such an instruction was strategic (*see* Dissenting Opinion *post* at 134, 136), that there can be no compensatory damages for a loss of liberty unless that injury is reflected in emotional or economic harm (*see id.* at 134), and that the district court's "failure to instruct the jury that it could award [Kerman] compensatory damages for a *loss of liberty in the abstract*, without regard to any injury compensable at common law" was not error (*id.* at 137 (citing *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986)) (emphasis ours)). Taking these points in reverse order, we remain unpersuaded for the reasons that follow.

We see no parallel between Kerman's claims in the present case and the abstract concepts that were at issue in *Stachura*. In *Stachura*, the Court dealt with claims for violations of the plaintiff's rights to procedural due process and academic freedom, and the trial court had instructed the jury that it could award damages for "the abstract 'value' or 'importance' of constitutional rights," 477 U.S. at 310, 106 S.Ct. 2537, 91 L.Ed.2d 249 (quoting trial court's instructions), and for " 'the importance of the right in our system of government' "

and " 'the role which this right has played in the history of our republic,' " *id.* at 303, 106 S.Ct. 2537 (quoting trial court's instructions). There is no question in the present case of any attempt to vindicate the liberty rights of society at large.

Further, the Supreme Court in *Stachura*, in disapproving the instructions that would have allowed an award based on the abstract societal value of constitutional protections, expressly distinguished that impermissible abstraction from the theory that is pertinent here, to wit, the traditionally permissible concept of "presumed damages." The Court noted, citing *Carey v. Piphus*, 435 U.S. at 262, 98 S.Ct. 1042, 55 L.Ed.2d 252, that "[w]hen a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish, some form of presumed damages may possibly be appropriate," *Stachura*, 477 U.S. at 310–11, 106 S.Ct. 2537, 91 L.Ed.2d 249, and that "presumed damages may roughly approximate the harm that the plaintiff suffered and thereby compensate for harms that may be impossible to measure," *id.* at 311, 106 S.Ct. 2537. In *Carey*, which involved a denial of procedural due process before suspensions from school, the Court noted that the doctrine of presumed damages in the common law of defamation *per se* deals with harms that are "virtually certain" to be caused by such defamation. 435 U.S. at 262, 98 S.Ct. 1042.

The present case does not involve either procedural due process or an attempt to vindicate an abstract societal interest. Rather, it involves an anything-but-abstract physical detention. And although a given person's loss of time may be difficult to evaluate in terms of dollars, his loss of liberty is not just "virtually certain" to occur; it is inseparable from the detention itself.

■ Accordingly, the availability of compensatory damages for time lost as a result of an unlawful detention was recognized at common law. We disagree with the dissent's view that the common-law concept of loss of time encompasses only loss of economic opportunity (*see* Dissenting Opinion *post* at 136–37). The only cases cited in support of that view are not false-imprisonment cases but rather are cases in which the plaintiffs sought compensation for earnings lost due to injuries suffered as a result of the defendants' negligence. *See Southwestern Brewery & Ice Co. v. Schmidt*, 226 U.S. 162, 33 S.Ct. 68, 57 L.Ed. 170 (1912) (employee scalded by employer's defective cooking device); *Espana v. United States*, 616 F.2d 41 (2d Cir.1980)(traffic accident); *Kies v. Binghamton Railway Co.*, 177 A.D. 242, 163 N.Y.S. 736 (3d Dep't 1917) (railway accident). We would agree that in such negligence cases, the "loss of time" concept focuses squarely on economic losses. In the false-imprisonment context, however, the "loss of time" concept is not so narrow. A loss of time, in the sense of loss of freedom, is inherent in any unlawful detention and is compensable as "general damages" for unlawful imprisonment without the need for pleading or proof. *See, e.g., McCormick on Damages* § 107, at 375 ("For ... false imprisonment, upon pleading and proving merely the unlawful interference with his liberty, the plaintiff is entitled to *'general' damages for loss of time* ...." (emphasis added)). The loss of time, an injury distinct from mental suffering or humiliation, may, but need not, have economic consequences; if recovery for an economic loss is sought, the common law treats that loss as an item of special damage that must be pleaded and proven. *See, e.g., id.* at 376, (" '[G]eneral' damage [for false imprisonment] would *include* at least *the value of the time lost* by the plaintiff during the period of detention *and*

any mental suffering or humiliation sustained in consequence of the arrest or restraint.... [I]tems of *special* damage ... [include] *the interruption of business, or the loss of a particular business opportunity or employment* ...." (emphases added)).

The traditional availability of damages for loss of time as a result of false imprisonment has been recognized by the New York courts. As indicated above, the New York Appellate Division decisions in *Hallenbeck v. City of Albany* and *Woodard v. City of Albany* sanctioned false-imprisonment awards of $10,000 for a three-hour detention and $7,500 for a five-hour detention, respectively. Those opinions contained no indication whatever that the plaintiff had shown any economic loss. Further, the court in each case noted that "there [wa]s no indication that [t]he [plaintiff] incurred any substantial physical or mental" injury or suffering, *Hallenbeck v. City of Albany*, 99 A.D.2d at 640, 472 N.Y.S.2d at 189; *Woodard v. City of Albany*, 81 A.D.2d at 947, 439 N.Y.S.2d at 702. If in either of these cases there had been some showing of a physical or mental injury but one that was not substantial, such an injury would not have supported an award of more than nominal damages, *see, e.g., Brian E. Weiss, D.D.S., P.C. v. Miller*, 166 A.D.2d 283, 283, 564 N.Y.S.2d 110, 111 (1st Dep't 1990) (nominal damages to be awarded where the plaintiff establishes liability but fails to prove "a *substantial* loss or injury to be compensated" (emphasis added)), *aff'd*, 78 N.Y.2d 979, 574 N.Y.S.2d 932, 580 N.E.2d 404 (1991). Since plainly more-than-nominal awards of $10,000 and $7,500 were allowed, we read the *Hallenbeck* and *Woodard* decisions as supporting the appropriateness of several-thousand-dollar awards for simply the loss of even a few hours' time spent in an unlawful detention.

Thus, although the dissent states that "[a] loss of liberty, by itself, does not warrant a compensatory damages award any more than any other constitutional violation" (Dissenting Opinion *post* at 135), and that "to recover compensatory damages for a loss of liberty in a § 1983 action, a plaintiff must show that he suffered an injury compensable under the common law of torts" (Dissenting Opinion *post* at 135), the New York and hombook authorities reveal that the loss of liberty inherent in an unlawful detention is an injury compensable under the common law of torts.

Nor can we view Kerman's failure to request an instruction that he was entitled to compensation for loss of time resulting from his detention as strategic, rather than as merely an oversight, given that such a request would not have been the least bit inconsistent with his claims of physical, mental, and emotional injury.

Finally, we note that the damage done by the court's failure to instruct the jury that it could award Kerman compensatory damages for the loss of liberty inherent in an unlawful detention may well have been compounded by the court's erroneous instruction on nominal damages. The court instructed that "when the plaintiff has been deprived of a right .... as a result of any of the defendant's conduct," but no "actual" damages have been suffered, "[n]ominal damages *may* be awarded," and "if you find ... the deprivation of a legal right" but no other injury, "you *may* award, *if you so choose*, nominal damages not to exceed $1." (Tr. 761 (emphases added).) It is established, however, that "[i]f a jury finds that a constitutional violation has been proven but that the plaintiff has not shown injury sufficient to warrant an award of compensatory damages, .... it is plain error to instruct the jury merely that, having found a violation, it 'may' [rather than must] award nominal dam-

ages." *Robinson v. Cattaraugus County*, 147 F.3d at 162. The jury here did in fact find that Kerman should receive nominal damages, making the court's use of "may" rather than "must," inconsequential insofar as nominal damages were concerned. But we have no confidence that the jury would not have awarded compensatory damages for the deprivation that it found unlawful if the court had instructed it that, upon such a finding, the jury "must" award Kerman at least nominal damages and could award him compensatory damages. Unquestionably the law authorizes the vindication of constitutional violations resulting in nonserious injury through awards of nominal damages. But it is the province of the jury to determine whether the plaintiff's injury resulting from a demonstrated loss of liberty was serious or nonserious and, if serious, to determine what compensation should be awarded. The jury here was not given instructions that provided it with guidance adequate to carry out that function.

Finding no significant difference between the present case and *Raysor*, in which we remanded for a new trial despite the plaintiff's failure to ask the district court to instruct the jury that it could award damages for his loss of liberty, we conclude that the failure in this case to give the jury any indication that it could consider awarding compensatory damages for an injury that was inherent in a confinement found to be unlawful was a fundamental error. Kerman remains entitled to have a jury assess the compensation he should be awarded on his Fourth Amendment claim against Crossan and his state-law claims against Crossan and the City for his loss of liberty for the time spent in the postsearch confinement without his consent.

### 3. *The Scope of the New Trial*

■ Where "it is clear from the undisputed evidence that a plaintiff's injuries were caused by a defendant's [unlawful conduct], the jury's failure to award some compensatory damages will be set aside and a new trial ordered." *Haywood v. Koehler*, 78 F.3d at 104; *see, e.g., Wheatley v. Beetar*, 637 F.2d at 867. And in such a case, where the jury has addressed the issues of liability and damages separately and there is no basis for inferring that the finding on liability was a compromise verdict or was otherwise procedurally flawed, the new trial may be limited to the quantification of compensatory damages. *See, e.g., Wheatley v. Beetar*, 637 F.2d at 867–68; *Baskin v. Hawley*, 807 F.2d at 1135; *Martell v. Boardwalk Enterprises, Inc.*, 748 F.2d 740, 756 (2d Cir.1984); *see also Haywood v. Koehler*, 78 F.3d at 104 ("new trial [ ]usually limited to the issue of the amount of compensatory damages").

In the present case, the jury was given interrogatories the answers to which revealed its findings on discrete questions of liability and damages. The proper instructions to the jury on the liability issues were clear, and we see no indication that the jury's finding as to the lack of probable cause was a compromise verdict. We conclude that the liability issues were fairly tried and resolved. Accordingly, in light of the jury's finding that Crossan acted without probable cause, Kerman was entitled as a matter of law to an award of compensatory damages for so much of his postsearch loss of liberty as was attributable to Crossan, and it is appropriate to limit the new trial—the third trial in this case—to the amount of compensatory damages that Kerman should receive for his loss of liberty.

We note that if Crossan had asked the district court to present to the jury the questions that needed to be answered in order to permit him to prevail on his affir-

mative defenses, and if the court had refused to do so, we would order a new trial encompassing also the issues of privilege and qualified immunity. However, he made no request that the requisite findings be made by the jury, despite the explicit guidance given in *Kerman II* that such findings by the jury were necessary. Accordingly, we see no just reason to order a new trial with respect to his defenses.

On remand, the jury should be informed that it has been established that Crossan's orders for Kerman's detention and hospitalization after completion of the officers' search for a gun violated Kerman's Fourth Amendment right to be free from unlawful seizure and his state-law right to be free from false imprisonment. The jury should be properly instructed on the matter of foreseeability; and it should be asked to determine, based on the evidence admitted at the new trial, the duration of Kerman's postsearch detention and hospitalization attributable to Crossan and the amount of damages that will compensate Kerman for that loss of liberty. Placing a value on Kerman's loss of liberty—necessarily a subjective exercise, *see, Raysor,* 768 F.2d at 39—is the province of the jury, subject to the court's power to set aside a verdict that is excessive, *see, e.g., Gardner v. Federated Department Stores, Inc.,* 907 F.2d at 1353 (ordering conditional remittitur of damages award for loss of liberty); *id.* at 1351 (noting a conditional remittitur ordered by district court as to another category of damages).

Finally, we note that Kerman states that Judge Patterson indicated that any renewed proceedings in the district court would be held before a different judge, and Kerman states that he has no objection to a reassignment. This Court sees no basis whatever for instructing that the matter be remanded to a different judge of the district court, and we leave any such administrative decision to that court.

## CONCLUSION

We have considered all of Crossan's contentions on this appeal and have found them to be without merit. The order of the district court granting judgment as a matter of law to Crossan is reversed. The April 23, 2002 judgment dismissing the complaint is vacated to the extent that it dismissed Kerman's Fourth Amendment claim against Crossan and the false imprisonment claims against Crossan and the City following the officers' completion of their search for a gun. The matter is remanded for a new trial on the issue of the amount of compensatory damages to be awarded to Kerman for loss of liberty.

Costs to plaintiff.

RAGGI, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority opinion to the extent it reverses the grant of judgment as a matter of law to Crossan. I respectfully dissent, however, from Part III.C.2, which concludes that the district court committed fundamental error in failing to charge the jury that it could award Kerman compensatory damages for lost liberty based on the loss of his time while he was unlawfully confined. *See* Maj. Op. at 129, 132 ("[T]he trial court should have informed the jury that if it found Crossan acted without probable cause it should award Kerman compensation for the loss of his liberty.... Kerman remains entitled to have a jury assess the compensation he should be awarded on his Fourth Amendment claim against Crossan and his state-law claims against Crossan and the City for his loss of the time spent in the postsearch confinement without his consent.").

As this court recently reiterated, the standard for establishing that a civil jury charge is fundamentally erroneous under

Federal Rule of Civil Procedure 51 is stern. *See SCS Communications, Inc. v. Herrick Co.*, 360 F.3d 329, 343 (2d Cir. 2004). More is required than "plain error," as that term is understood in the criminal context. *Id.* An error will be deemed fundamental in a civil case only if it is "so serious and flagrant that it goes to the very integrity of the trial." *Id.* (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 61 (2d Cir.2002) (quoting *Shade ex rel. Velez–Shade v. Hous. Auth. of New Haven*, 251 F.3d 307, 312 (2d Cir.2001))). I do not think this is such a case.

As the majority opinion explains, an individual subject to false imprisonment may be compensated not only for tangible injuries, such as out-of-pocket expenses and lost wages, but also for intangible injuries, such as loss of time, physical discomfort or inconvenience, mental suffering, and humiliation. *See* Maj. Op. at 125; *see also Raysor v. Port Auth. of New York & New Jersey*, 768 F.2d 34, 39 (2d Cir.1985); W. Page Keeton et al., *Prosser & Keeton on Law of Torts* § 11, at 48 (5th ed.1984). Precisely because false imprisonment is "a dignatory tort," 59 N.Y. Jur.2d *False Imprisonment and Malicious Prosecution* § 147, at 406 (2003), the injuries generally resulting from it are likely to be intangible. Thus, in *Raysor v. Port Authority of New York & New Jersey*, 768 F.2d at 39, a false arrest case pursued by a *pro se* plaintiff, this court ruled that the district court committed fundamental error when it failed to charge the jury that it could award monetary damages for intangible injuries, even though no such charge was requested.

Relying on *Raysor*, the majority concludes that in this case the district court committed a similar fundamental error by failing *sua sponte* to charge the jury that it could compensate Kerman for the intangible injury of lost time. I am not convinced. In *Raysor*, the error was a *total* failure to instruct the jury that intangible injuries were compensable for false imprisonment. By contrast, in this case the district court did not overlook Kerman's entitlement to compensation for intangible injuries. To the contrary, it specifically instructed the jury that it could award damages for any "emotional mental anguish" that Kerman had sustained as a result of his false imprisonment. Trial Tr. at 760. Because the intangible injuries caused by false imprisonment are "large[ly] ... mental," *Prosser & Keeton* § 11, at 48, this charge afforded the jury considerable latitude in making a compensatory award. Indeed, the charge comported with Kerman's trial strategy. In arguing for damages in summation, Kerman's counsel focused exclusively on the mental humiliation his client had suffered as a result of the unlawful detention, repeatedly emphasizing the extent of his embarrassment, particularly in being removed from his home in a restraint bag. *See* Trial Tr. at 714–17, 721–23. Nowhere in summation did counsel allude to any loss-of-time injuries sustained by Kerman. Thus, the error in this case is not, as in *Raysor*, the court's failure to instruct the jury that it could compensate plaintiff for intangible injuries. Nor is it a failure to instruct the jury that it could compensate plaintiff for the specific intangible injuries argued by plaintiff in summation. Instead, the identified charging error is the court's failure to instruct the jury that it could compensate plaintiff for a type of intangible injury never argued by plaintiff: the loss of time.

In concluding that this error is fundamental, the majority appears to equate "loss of time" with "loss of liberty," and to hold that any unlawful detention that spans several hours necessarily involves lost time that should receive a compensatory award. *See* Maj. Op. at 129. I must disagree.

Preliminarily, I do not understand "lost time" and "lost liberty" to be identical concepts. "Loss of liberty" describes the Fourth Amendment violation that occurs when a person is confined against his will by the government; it is the constitutional tort. "Loss of time," on the other hand, is simply one of a variety of compensable injuries, tangible and intangible, that can result from a loss of liberty.[1] A loss of liberty, by itself, does not warrant a compensatory damages award any more than any other constitutional violation. This is not to ignore the seriousness of constitutional violations. The law vindicates such violations through awards of nominal damages, even absent proof of actual injury. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n. 11, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) ("By making the deprivation of such rights actionable for nominal damages without proof of actual

injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury ...." (quoting *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978))); *see also Shain v. Ellison*, 273 F.3d 56, 67 (2d Cir.2001) (upholding nominal award of $1.00 in case of unlawful strip search). But to recover compensatory damages for a loss of liberty in a § 1983 action, a plaintiff must show that he suffered an injury compensable under the common law of torts. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. at 306, 106 S.Ct. 2537, 91 L.Ed.2d 249; *Carey v. Piphus*, 435 U.S. at 258–59, 98 S.Ct. 1042.[2]

"Loss of time" is an injury that has long been cognizable at common law. Its focus, however, is not on the general loss of

1. One commentator catalogues these injuries to include loss of time, physical discomfort or inconvenience, physical injury or injury to health, mental suffering, humiliation, business loss, harm to reputation or credit, loss of family company, as well as any special damages unique to the particular plaintiff's case. *See Prosser & Keeton* § 11, at 48. Another lists mental anguish or suffering, shame and humiliation, ridicule and scorn, moral and mental degradation, onerous and lengthy interrogation, indignity and disgrace, damage to reputation, interruption to or loss of business, loss of earnings or credit, loss of or damage to property, physical injury, including medical expenses, the loss of family company, disturbance of one's normal life, as well as legal and other expenses associated with securing release, with no distinct mention of "lost time." *See* 59 N.Y. Jur.2d *False Imprisonment and Malicious Prosecution* § 147, at 406–08; *see also* N.Y. Pattern Jury Instructions 3.5 Commentary at 49 (citing cases holding that plaintiffs who suffer false imprisonment may recover compensatory damages for mental anguish, shame and humiliation, injury to reputation, physical suffering or bodily injuries, loss of earnings or business, and medical and legal expenses).

At least one district court in this circuit appears to have used "deprivation of liberty" in charging a jury to describe the intangible injuries to a person's dignity that could result from false imprisonment in order to distinguish those injuries from the pain and suffering attributable to diagnosed physical and mental injuries. *See Gardner v. Federated Dep't Stores, Inc.*, 717 F.Supp. 136, 137–38 (S.D.N.Y.1989), *aff'd in part and vacated in part*, 907 F.2d 1348 (2d Cir.1990). It seems to me more confusing than helpful to use "deprivation of liberty," the constitutional tort, to refer to a subset of the injuries that can result therefrom.

2. I do not read cases such as *Hallenbeck v. City of Albany*, 99 A.D.2d 639, 472 N.Y.S.2d 187 (3d Dep't 1984) and *Woodard v. City of Albany*, 81 A.D.2d 947, 439 N.Y.S.2d 701 (3d Dep't 1981), cited by the majority, *see* Maj. Op. at 126, to hold otherwise. In each of those cases, the courts vacated excessive jury awards in false arrest cases because plaintiffs failed to demonstrate *"substantial* physical or mental injury," ordering new trials unless the plaintiffs agreed to reduced verdicts of $10,000 and $7,500 respectively. *Hallenbeck v. City of Albany*, 99 A.D.2d at 640, 472 N.Y.S.2d at 189 (emphasis added); *accord*

liberty, but on a discrete form of economic harm: plaintiff's inability to work. *See* 22 Am.Jur.2d *Damages* §§ 138, 139, 158 (2003); 25 C.J.S. *Damages* § 54, at 391–92 (2002); 36 N.Y. Jur.2d *Damages* § 68, at 118–19 (1984); *see also Southwestern Brewery & Ice Co. v. Schmidt*, 226 U.S. 162, 169, 33 S.Ct. 68, 57 L.Ed. 170 (1912) (Holmes, J.) (noting that jury was instructed to "consider the plaintiff's loss of time with reference to his ability to earn money"); *Kies v. Binghamton R.R. Co.*, 177 A.D. 242, 245, 163 N.Y.S. 736, 739 (3d Dep't 1917) (holding that damages for loss of time require proof of the value of services that an injured party could have performed). Loss of time is a more expansive concept than lost wages. It compensates a plaintiff for his lost capacity to earn, and may be sought even by a plaintiff who was unemployed at the time of the injury. *See Espana v. United States*, 616 F.2d 41, 43 n. 2 (2d Cir.1980); Restatement (Second) of Torts § 924(b) & cmt. c (1979); 22 Am.Jur.2d *Damages* § 158, at 169; 36 N.Y. Jur.2d *Damages* § 68, at 118–19; *see also* C. McCormick, *Handbook on the Law of Damages* § 87, at 309 (1935) (*McCormick on Damages* ) (observing that the value of lost time can be shown by "opinion evidence of what plaintiff's services are worth in the local market"). For

this reason, commentators view lost time as inherent in false imprisonment and compensable through a general damages award unless, of course, particular lost earning opportunities are proved to warrant specific damages. *McCormick on Damages* § 107, at 376. In this respect, lost time is the economic counterpart to the psychic injury also inherent in false imprisonment: interference with a person's ability to enjoy life.[3] This injury is also recognized and compensated generally at common law, but as a form of mental anguish and suffering, *see id.*, the injury charged by the court and rejected by the jury in Kerman's case.[4]

Kerman's decision not to seek damages for loss of time, but to focus, instead, on obtaining a compensatory award based on the pain and mental anguish experienced during his detention cannot be deemed strategically unreasonable. Kerman's somewhat-fragile mental state on the date of the arrest would have made it difficult to assert that his earning capacity at the time was particularly high. On the other hand, counsel could, and did, suggest that Kerman's vulnerability made his mental anguish particularly acute. Where counsel makes a strategic decision to argue one type of intangible injury and not another, I

*Woodard v. City of Albany*, 81 A.D.2d at 947, 439 N.Y.S.2d at 702. In neither case, however, did the court suggest that if the plaintiffs went to trial, the juries would have to award them some damages for lost liberty, even absent a showing of physical or mental injury. Similarly in *Gardner v. Federated Department Stores, Inc.*, 907 F.2d at 1353, the case in which the district court labeled injuries to plaintiff's dignity as a "deprivation of liberty," this court ordered a new trial unless plaintiff accepted $50,000 in lieu of the jury's excessive award of $150,000. We did not, however, suggest that plaintiff could recover such a damage award without proof of any injury to her dignity. In fact, the evidence appears to have included specific proof of humiliation. *Id.* at 1350.

3. Although the majority asserts that lost time encompasses injuries that go beyond the economic and the psychic, it does not identify what these are or how a district court should instruct a jury to distinguish among these injuries to ensure reasonable general damages awards.

4. I expect it will be a rare case in which a jury decides not to award any compensatory damages for mental anguish and suffering to a plaintiff who has been detained for more than a trivial amount of time in violation of the Fourth Amendment. Nevertheless, for the reasons stated by the majority, I agree that we must defer to the jury's decision not to award Kerman any such damages.

do not think the district court commits fundamental error by charging only the intangible injury theory pursued.

In sum, I do not think the integrity of Kerman's trial was compromised by the district court's failure to charge loss of time, a theory of economic injury not pursued by plaintiff. Nor, in light of *Memphis Community School District v. Stachura*, do I think the trial's integrity can be questioned based on the court's failure to instruct the jury that it could award compensatory damages for a loss of liberty in the abstract, without regard to any injury compensable at common law. The district court having properly charged the jury that it could compensate Kerman for mental anguish and suffering—a form of intangible injury recognized at common law, long associated with unlawful confinement, and exclusively pursued by plaintiff—I cannot conclude that there was a fundamental error in the charge warranting a new trial. Accordingly, on this point, I respectfully dissent.